NANCY BENDER, Plaintiff-Appellee, *v.* CONSOLIDATED MINK RANCH, INC., Defendant-Appellant.

Second District   No. 81—1028

Opinion filed November 1, 1982.—Rehearing denied December 7, 1982.

Burl F. Nader, of Libertyville, for appellant.

Joel S. Ostrow, of Chicago, for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

This action was brought by an employee of the defendant mink ranch to recover damages, alleging that the employer, which was raising her minks, refused to surrender the minks to her upon demand. A jury fixed her damages at $17,600 and found against the defendant on its counterclaim, upon which the trial court entered the judgment from which this appeal is taken. We affirm.

Three issues are presented for review: (1) Whether the trial court properly denied the defendant-employer's motion for a directed verdict; (2) Whether the jury was properly instructed as to damages, and (3) Whether the trial court erred in failing to grant a continuance for trial.

Plaintiff, Nancy Johnson Bender, filed a two-count complaint in the circuit court of Lake County against Consolidated Mink Ranch, Inc. (hereinafter CMR).

Count I, stating a cause of action for conversion, alleged that CMR, lawfully in possession of 417 minks and storage equipment (a housing shed) owned by the plaintiff, unreasonably refused to tender same to her upon demand made "on or about June 26, 1979."[1] Her complaint alleged on information and belief that CMR shipped 200 of the minks to auction where CMR would unlawfully realize the proceeds of said sale. She claimed the value of the minks, and her damages, to be $25,800. An additional $25,000 was claimed as exemplary damages, which claim was stricken at the close of the evidence at trial.

An amended count II, for breach of contract, alleged that plaintiff and CMR entered into an agreement whereby plaintiff purchased 50 female and 11 male minks from CMR. The agreement, dated Decem-

---

[1]This appears to be in error; the testimony indicates the date was July 27, 1979.

ber 22, 1974, and indicating a duration period of December 1, 1974, to December 1, 1975, was annually orally renewed between the parties for the years 1975 through 1978. Count II alleged that the plaintiff performed all of her obligations under the agreement and that despite a provision of the agreement that it was terminable at will by either party, CMR refused to allow her to terminate same and remove her minks and storage equipment from the premises upon her demand. Plaintiff claimed actual damages of $25,000 due to CMR's breach of the contract.

In its answer, CMR admitted it had lawful possession of the minks, cared for the minks after plaintiff ceased her employment at the ranch in June 1979, and that it sold the mink pelts to cover the cost of said care, pelting and sale. As a defense, CMR alleged plaintiff left her employment with CMR abruptly and without notice and that the minks would have died within two to three days if CMR had not continued to provide the care necessary to keep the minks alive. CMR alleged plaintiff failed to respond to its July 23, 1979, letter and that it, therefore, considered she had abandoned her minks. Accordingly, CMR requested plaintiff's count I for conversion be dismissed.

CMR also counterclaimed for an agister's lien pursuant to section 50 of "An Act to revise the law in relation to liens" (Ill. Rev. Stat. 1981, ch. 82, par. 59), in the amount of $16,000 which was based on an approximate cost of $40 per pelt produced for sale to cover the cost of feed and care rendered to the minks.

CMR's answer to amended count II admitted the agreement and the fact of annual oral renewal of the agreement, but denied plaintiff performed all of her obligations under the contract, or that the contract was terminable at will. CMR further denied plaintiff informed it that she wished to terminate the agreement or asserted her right to remove the minks and storage equipment from the ranch. CMR's first defense to the amended count II was stricken and it counterclaimed for set-off in the amount of $16,000 to cover the cost of care and feeding of the minks.

The plaintiff had begun working part-time on the ranch while she was in high school in 1973, and later she became the ranch's only full-time employee in December 1974 when she purchased the minks from CMR. She was paid hourly for her work and, although her minks were kept and tagged separately from those which belonged to CMR, they were cared for by everyone on the ranch staff, including plaintiff, in the usual course of the ranching operation. The minks were usually bred in March, born in April or May, and raised until November or December when the majority were slaughtered for their pelts.

The highest quality minks were retained as breeders. Her herd increased in size to 400 in 1979, including 80 adult females and 16 adult males. Her 1978 crop of minks were sold at auction in 1979 by the Hudson Bay Company in New York, for which she received $9,000.

Due to illness, plaintiff left the ranch during the afternoon of June 25, 1979, and the next day telephoned Willard J. Nieland, the president of CMR, that she would return when she felt better. As of June 25, 1979, plaintiff was current under the payment terms of the agreement which she and Willard J. Nieland had orally renewed in December 1978.

Plaintiff returned to the ranch on July 27, 1979, with her husband, William Bender. She testified she told Nieland she would not be coming back to work since she was too sick and could not do the work. Nieland said if she was not coming back to work, that he would give her $1,000 for her minks at the end of the year. She said she would take her minks and shed, but he refused to allow her to do that; she then said she would continue to make payments, but he said no to that as well, and told her she had to come back to work. Her testimony was corroborated by her husband's testimony.

At the time plaintiff talked with Nieland, she had not yet received his letter dated July 23, 1979, giving her until August 3 "to call, or come, and discuss this with me [Nieland] as [sic] regards [sic] to the continuation or termination of this agreement in a calm and businesslike manner," otherwise "it will be considered that you [plaintiff] have completely abandoned your agreement and your animals." Nieland did not mention the letter to plaintiff on July 27, assuming that she had received it. He later received the return receipt for the registered letter which indicated she had received the letter on August 7. Because August 3 had already passed, and because Nieland had already refused to let her take her minks and shed, she did not respond to the letter.

In a November 2, 1979, letter to Nieland from an attorney representing the plaintiff, plaintiff admitted she was in arrears in the amount of $3,000 for feed, etc., and stated she was willing and able to resume work at the ranch. Plaintiff paid $260 per month for feed, etc., for the first six months of 1979; the monthly payment for the last six months of each year was usually discussed and agreed upon in July, but the exact amount per month for the remainder of 1979 had not yet been agreed upon when plaintiff left the ranch. Plaintiff testified that the figure of $600 per month had been discussed; Nieland said they discussed $800 per month. The admitted $3,000 arrearage would appear to be based on plaintiff's estimated monthly charge of

$600. Nieland did not respond to the November 2 letter. Plaintiff then filed the instant complaint in February 1980.

The defendant, CMR, first asserts the evidence does not and cannot sustain a judgment for conversion and breach of contract; therefore, the trial court erred in denying its motion for directed verdict. It argues that plaintiff's discussion with Nieland on July 27, 1979, did not constitute a demand for possession of the minks, generally referring to plaintiff's testimony at trial that she did not intend to remove the minks from the ranch on that date. Citing *Hobson's Truck Sales, Inc. v. Carroll Trucking, Inc.* (1971), 2 Ill. App. 3d 978, CMR argues that the essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of the owner thereof, and that the owner's demand for possession of the property and the defendant's subsequent refusal are necessary for the maintenance of an action for conversion. Here, CMR argues, the purported demand made by the plaintiff on July 27 was not repeated after that date, and her acknowledgment of her arrearage in payments to CMR and offer to return to work in the November 2 letter from her attorney to CMR amounted to a ratification and approval of the ranch's possession of the minks after July 27. CMR additionally contends its possession of the minks after July 27, and its subsequent sale of the pelts was lawful, since it had an agister's lien pursuant to section 50 of "An Act to revise the law in relation to liens" (Ill. Rev. Stat. 1981, ch. 82, par. 59; *Henkel v. Pontiac Farmers Grain Co.* (1977), 55 Ill. App. 3d 898.) Lastly, CMR argues plaintiff produced no evidence that it breached its agreement with her since the plaintiff's shed would be removed only at the end of each ranching season, and not whenever she desired to move it.

As plaintiff correctly notes, the issue raised by the defendant limits review of the evidence to the standard first enunciated in *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, to-wit:

> "[V]erdicts ought to be directed *** only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand."

Accord, see, *e.g.*, *Main Bank v. Baker* (1981), 86 Ill. 2d 188, 194; *Christou v. Arlington Park-Washington Park Race Tracks Corp.* (1982), 104 Ill. App. 3d 257, 259.

It has been established that a defendant's contention on appeal that the trial court erred in refusing to direct a verdict does not call upon the appellate court to substitute its judgment for that of the jury; rather, the appellate court, like the trial court below, must deter-

mine whether all the evidence, when viewed in its aspect most favorable to the plaintiff, so overwhelmingly favored the defendant that no contrary verdict based thereon could ever stand. (*Neubauer v. Coca Cola Bottling Co.* (1968), 96 Ill. App. 2d 18.) Plaintiff asserts the evidence presented was sufficient to withstand a motion for directed verdict on either or both counts, and the trial court did not err when it denied the defendant's motion for directed verdict.

Plaintiff argues that any ambiguities in the contract must be construed most strongly against the defendant since it drafted the contract (*Epstein v. Yoder* (1979), 72 Ill. App. 3d 966, 973), and that since the contract was for the benefit of the plaintiff, not CMR, the plaintiff may waive any of its benefits. (*Bartels v. Denler* (1975), 30 Ill. App. 3d 499, 501.) Plaintiff points out that it was established at trial that the contract did not obligate, nor was it contingent upon, plaintiff's continued employment at the ranch, and that she was paid up in full pursuant to the contract terms through June 30, 1979, and that the prorated monthly charge to her for the last six months of 1979 had not yet been determined. Further, on July 27, 1979, CMR owed plaintiff $500 in back wages, which plaintiff eventually recovered through the Labor Relations Board. Plaintiff notes the remaining disputed issue regarding the contract, whether it was terminable at will, was determinable by reference to the contract itself. In the contract it was stated that plaintiff "is allowed to keep her mink on the premisis [*sic*] until December 1, 1975"—a benefit she may waive (30 Ill. App. 3d 499)—and that "if N.J. [the plaintiff] decided to discontinue ranching, she can dismantle her shed and move it off the premisis [*sic*], or sell it to CMR if a mutually agreeable price can be reached."

Nieland testified at trial that this clause was meant to refer to the end of the year, at pelting time because the term of the agreement was from December to December; however, plaintiff argues such an interpretation would render that part of the contract meaningless, contrary to the general rule that contracts are to be construed so as to give all parts meaning and render no part extraneous.

■ With regard to the conversion count, plaintiff points out that both she and her husband testified a demand for the minks was made to the defendant on July 27, 1979, and that this evidence alone—when viewed in its aspect most favorable to the plaintiff—was sufficient to resist entry of a directed verdict. Additionally, however, there was evidence of defendant's letter to plaintiff dated July 23, to the effect that her minks would be confiscated if she did not make known her intentions about returning to work at the ranch. Further, plaintiff cor-

rectly posits that the defendant had no claim for an agister's lien since such a lien is not available to one who has converted the livestock, and where there is no express or implied contract upon which to base a claim for an agister's lien. *Reynolds ex rel. Jones v. Weakly* (1938), 293 Ill. App. 384, 388-89.

██ █ In our opinion, the court properly denied the defendant's motion for a directed verdict. The evidence, viewed in its aspect most favorable to the plaintiff, was sufficient to sustain the jury's verdict on either or both of the counts in the complaint. No explicit ruling was requested of, or made by, the court as to the ambiguity of the contract insofar as it provided for termination at will. Consequently, by implication, as argued by the plaintiff, the contract was unambiguous or, if any ambiguity existed in the contract, its interpretation became a question of fact for the jury. (*Standard Steel & Wire Corp. v. Chicago Capital Corp.* (1975), 26 Ill. App. 3d 915, 920.) The evidence quite clearly showed the plaintiff had performed all that was required of her under the terms of the agreement, and that when she requested possession of her minks, the defendant refused. The fact that plaintiff was entitled to possession of the minks—wherefore defendant's refusal to deliver possession amounted to unlawful conversion—is not negated by the fact she did not intend to immediately *remove* the minks from the premises, nor by the fact she had not made alternate housing arrangements for the minks. The essence of conversion is the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held. (*Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, 932.) Further, the contract clearly provided that if the plaintiff decided to discontinue ranching, she could dismantle her shed and move it, or sell it to the defendant at a mutually agreeable price. Defendant's protestations to the contrary, nothing in the contract indicated the decision to discontinue ranching could only be made at the end of the contract year nor, in fact, did the contract obligate the plaintiff to actually raise her minks to the point at which they could be pelted. Certainly, it would be to her best advantage to do so, and under the contract, she had a right to raise the minks on the ranch, but not the duty to do so.

Accordingly, we conclude the trial court properly denied the defendant's motion for a directed verdict.

Defendant next argues the four separate instructions given to the jury—one each issues and damages instruction for conversion and breach of contract—misled the jury into believing that the plaintiff could have a double recovery when, in fact, she had only a single claim. Defendant further argues the damages instructions were incor-

rect since the measure of damages for conversion is market value at the time of the conversion. The instructions given for both count I in conversion and count II for breach of contract were that the plaintiff could recover damages, if proven, for the fair market value of her pelting shed, and for her future lost profits. Defendant cites *North Shore Marine, Inc. v. Engel* (1980), 81 Ill. App. 3d 530, *Jensen v. Chicago & Western Indiana R.R. Co.* (1981), 94 Ill. App. 3d 915, and *Henkel v. Pontiac Farmers Grain Co.* (1977), 55 Ill. App. 3d 898, in support. By applying the standard of the fair market value at the time of the conversion, defendant asserts plaintiff's damages could not have been more than $2,600 because there was testimony that the value of the 400 minks on July 27, 1979, was approximately $5 each. Adding to that the value of her shed, and deducting the cost of care for 27 days in July, the $2,600 figure results. Defendant also asserts, without citation of authority, only one issues instruction should have been given, since almost every conversion case arises from a bailment or from some kind of oral or written contractual agreement.

Plaintiff counters that the error, if any, was harmless or the result of defendant's own failure to provide separate verdict forms or special interrogatories. Plaintiff points out the judgment for $17,600 is sustainable as a single recovery on the breach of contract count on which the jury was properly instructed, and which defendant agreed at trial was the proper instruction for measure of damages for a breach of contract. Plaintiff notes the evidence was that the minks were sold for a net price of approximately $57 per pelt or—on the basis of 400 minks—a total of $22,800. There was evidence that the value of the shed was between $500 and $1,200, and that the monthly charge to the plaintiff for feed, etc., would have been anywhere between $600 and $800 or possibly higher. There was also evidence that the price received for the pelts, had plaintiff actually raised the minks to maturity and sold them, may have been reduced by as much as 50% due to the fact plaintiff's storage facilities for the minks were of an unimproved type which generally produced a "rough" quality fur, and also because she may have had to sell the pelts in general part lots, or odd lots, rather than in bundles due to the relatively small number of pelts she had to sell. There was also evidence that approximately 100 of the minks comprised plaintiff's breeding stock, the pelts of which usually only brought a price of approximately $12 each.

The damages instructions for conversion and breach of contract set forth the same elements: (1) the loss of the fair market value of plaintiff's pelting shed, and (2) the value of profits lost or reasonably certain to be lost in the future. Each instruction also admonished the

jury that: "Whether any of these elements of damages has been proved by the evidence is for you to determine." The record indicates that when the defendant objected to the conversion damages instruction, it apparently was prepared to tender a correct instruction (*i.e.*, fair market value of the minks as of the date of the conversion less the unpaid balance owed to defendant for feed, etc.). However, the instruction defendant apparently was prepared to tender was not preserved in the record, nor did the court refuse it; the trial court simply gave the damage instruction tendered by the plaintiff over the defendant's objection. Further, the defendant provided the verdict forms to be used by the jury. Neither of the forms allowed for a separate finding as to each count; the forms simply provided for a finding either for or against the plaintiff "on the plaintiff's complaint." Additionally, the defendant did not submit special interrogatories to be answered by the jury.

■ The plaintiff correctly argues that a judgment will not be reversed on the basis of faulty instructions unless the party complaining of the instructions can show prejudice as a result. (*Pendowski v. Patent Scaffolding Co.* (1980), 89 Ill. App. 3d 484, 489.) The fact that a single general verdict was returned by the jury rather than separate verdicts on count I and count II creates an ambiguity in that it is not clear whether the award was based on count I, count II, or both counts. Consequently, it is not known whether the jury was improperly influenced or misled by the erroneous conversion damages instruction. Further, the ambiguity was created by the defendant itself, and defendant cannot now complain of an error which itself induced. See *Edenburn v. Riggins* (1973), 13 Ill. App. 3d 830, 834; *City of Waukegan v. Stanczak* (1955), 6 Ill. 2d 594, 608.

■ The defendant has not challenged the sufficiency of the evidence to support a verdict on either count. Nor can it now complain that the jury was improperly instructed as to damages for breach of contract. (See *Rivenbark v. Finis P. Ernest, Inc.* (1976), 37 Ill. App. 3d 536.) As pointed out by the plaintiff, the absolute maximum damages which could have been assessed by the jury would have been $24,000; it found her damages to be only $17,600. The measure of damages for breach of contract is the amount needed to put the parties in the same position they would have been had the contract been performed. (*Laff v. John O. Butler Co.* (1978), 64 Ill. App. 3d 603, 619-20.) The determination of an adequate verdict is particularly within the province of the jury; great weight must be given to the jury's determination, and its results will not be disturbed unless all reasonable persons would agree that the amount is excessive. (*Kottmeyer*

*v. Consolidated Rail Corp.* (1981), 98 Ill. App. 3d 365.) In our opinion, the jury was properly instructed on the measure of damages for breach of contract. Due to defendant's own omission, the jury was not instructed to render separate verdicts on each of the counts; consequently, it is not known whether its verdict was on count I, count II, or on both counts. The jury could reasonably have believed the evidence which was most favorable to the plaintiff, and found defendant's evidence as to reduction in the value of the fur not to be credible. In sum, we believe the jury's verdict cannot be said to have been the result of error in instruction, nor does its verdict lack support in the evidence.

Lastly, defendant contends the trial court erred in failing to grant a continuance for trial. This issue is without merit. Defendant has presented this court with nothing but bare assertions of fact without any support in the record on appeal. The record reflects that the trial date of October 13 was set by order of the trial court on July 9. Defendant filed its interrogatories to be answered by the plaintiff on September 11. On October 13, the jury was called and sworn, and the cause continued until the next morning at 9:30. Defendant complains the trial court's refusal to grant an alleged joint motion for continuance resulted in a "ragged" trial.

■ The appellate court will not interfere with a trial court's exercise of its discretion in granting or denying a motion for continuance unless there has been a manifest abuse of such discretion or a palpable injustice apparent in the record on appeal. (*In re Estate of Cohn* (1981), 95 Ill. App. 3d 204, 208.) Defendant here has not shown any palpable injustice; in fact, the record indicates the parties had the benefit of the late afternoon and evening of October 13 to ready themselves before the trial actually commenced on October 14. There is no basis in the record to warrant this court's interference with the trial court's exercise of discretion in this matter.

The judgment of the circuit court of Lake County is affirmed.

Judgment affirmed.

SEIDENFELD, P.J., and LINDBERG, J., concur.