FRANCES COLLINS, Plaintiff-Appellee, *v.* INTERROYAL CORPORATION *et al.*, Defendants-Appellants.

First District (3rd Division)   No. 81—1971

Opinion filed June 29, 1984.

Kenneth T. Garvey, of Purcell & Wardrope, Chartered, of Chicago (Sidney Z. Karasik, of counsel), for appellants.

Joseph T. McGuire and Stephen C. Schulte, both of Perz & McGuire, of Chicago, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Frances Collins, brought this action for personal injuries sustained when a stool, defectively designed and manufactured by defendant Interroyal Corporation and distributed by defendant Killian Corporation, collapsed under her. A jury returned a verdict awarding plaintiff $200,000 compensatory damages against both defendants and $100,000.50 punitive damages against Interroyal. The trial court denied post-trial motions and entered judgment on the verdict. Both defendants appeal.

In counts I and II of her complaint, strict liability counts against Interroyal and Killian respectively, plaintiff alleged that the design of the adjustable leg connection mechanism was an unreasonably dangerous and defective condition because it failed to provide a reliable locking device that would prevent the leg adjustment screw from falling out, thus permitting the stool to collapse. Plaintiff charged that her injuries were caused by this unreasonably dangerous and defective condition. Count III charged wilful and wanton conduct by Interroyal in the design, manufacture, sale and distribution of the stool in question.

Interroyal, a designer and manufacturer of industrial stools since 1946, designed its model 515 adjustable height stool to meet varying demands for seat height. The stool incorporated a telescopic leg extension for height adjustment which allegedly provides "positive locking." Between 1968 and 1977, Interroyal designed and manufactured the 515 model stool with three different leg adjustment connector mechanisms. The first connector mechanism, employed at least since 1968, consisted of a self-tapping screw passing through one wall of the leg and the wall of the leg extension, with a star washer underneath the head of the screw. The screw in this single-wall construction design, referred to as design A, also served as a structural support component for the stool.

In September 1972, in connection with a lawsuit entitled Mix v. Interroyal, Herbert Painter of Snyder Research Laboratory, a consulting engineering firm, was retained on behalf of Interroyal's interests

in that suit. Painter, who testified for plaintiff in this suit, prepared a report based upon his evaluation of the design of an Interroyal single-wall model stool. The stool he examined was an exemplar of the one on which the Mix plaintiff had been injured when the leg of the stool collapsed. In Painter's opinion, the single-wall model stool was defective because the self-tapping screw could become loose and fall out from intermittent loading and from vibration caused by the dragging of the stool across a floor, both ordinary uses of the stool. Painter's Mix report was given to Interroyal in April 1973.

An engineering change order dated June 15, 1973, evidenced the second connection mechanism design incorporated in the 515 stool. This design employed a longer screw passing through both walls of the stool leg. The reason for this new double-wall construction, also referred to as design B, was to strengthen the union of the leg extension to frame assembly.

In March 1977, Interroyal instituted another design change in its 515 adjustable stool connector mechanism. Design C added a nut and bolt to the end of the screw. In May 1977, maintenance and assembly instructions were attached to all the stools.

Each design change was embodied in an engineering change order which stated the reason for the change and was signed by authorized Interroyal executives. The engineering change order discussed the disposition of stock on hand. The June 1973 order had a series of typed dashes, which meant that stock on hand was to be used up rather than reworked. The December 1973 order was blank, while the 1977 order required rework of the old stock.

Haig Dadourian, vice-president of Interroyal, testified as an adverse witness that he was unaware of any customer complaints and that the design changes were not made because of customer complaints. Dadourian did not know why the nut and bolt design was not implemented in June 1973. The effective dates on the engineering change orders did not mean that on that date the revisions actually went into effect, but rather meant that necessary steps to implement the changes should begin.

Donald Beutlespacher was plant engineer, maintenance superintendent and safety committeeman for Midwest American Dental, plaintiff's employer. In February 1974, he requisitioned the purchase of 85 Interroyal adjustable stools from Killian. Killian shipped 15 stools from its own stock, while Interroyal furnished the additional 70 stools. Beutlespacher testified that all 85 stools were equipped with the same leg construction design. No instructions or warnings accompanied these design A stools. The stools were assembled at a uniform

height and were sent to departments according to need. The control area where plaintiff worked was a new department in March 1974.

On December 19, 1974, at 6:45 a.m., plaintiff pulled a stool over and sat on it. The stool immediately collapsed, causing her to fall to the floor. As she fell, her left hip struck a metal conveyor behind her. She experienced severe pain and was taken to a hospital. Immediately after the accident, plaintiff and Thomas Parala, a first aid employee of Midwest, saw a stool with a metal back lying on the floor with one of its adjustable leg extensions telescoped up into the stationary leg portion of the stool.

Diane Blazina Creed testified for the defense that she was 10 feet from plaintiff at the time of the accident. Creed saw plaintiff sitting on a stool with a wooden back. Creed stated that when plaintiff fell, the wooden back separated from the chair. Creed did not know whether one of the stool legs had collapsed. Creed had stated at a deposition that she had worked the afternoon shift on the day in question. Creed also testified that Barbara Spiller witnessed the accident; but Spiller testified that she was home ill the day of the accident. Spiller stated that none of the four stools in that control area had wooden backs. Both Spiller and plaintiff testified that all stools in the control area were similar in appearance to exhibit No. 17, the Interroyal single-wall model design.

Sue Klasek testified for the defense that she saw plaintiff walk around a router file while carrying or dragging a stool. Plaintiff then fell slowly to the ground. Klasek's view was blocked so that she could not see if plaintiff was sitting on a stool or whether a stool fell. Klasek could not remember whether she saw a stool on the ground near plaintiff.

Shortly after the incident, a stool identified as the one on which plaintiff was injured was delivered to Beutlespacher's office. Beutlespacher testified that the stool, an Interroyal single-wall model design, had a collapsed leg due to a missing screw and that the metal back was still attached. Killian referred Beutlespacher to Fred Frey, then Interroyal's manager of product engineering. Pursuant to Frey's instructions, Beutlespacher sent the stool to Frey at Interroyal to be replaced at no charge along with a memo reiterating these instructions. To prevent further problems with the remaining stools, Frey instructed Beutlespacher to drill the leg adjustment holes through the other side of the leg, to insert machine screws through both holes, and then place a nut and star washer on the end of the screw.

In answer to an interrogatory requesting the names of each person in possession of the stool after the accident, Interroyal listed

Beutlespacher, then George Funk, Frey's successor, and then Triodyne, Inc., employer of defendant's expert witness, Ralph Barnett. In response to plaintiff's request for the stool at trial, defendants presented the stool's parts, exhibit No. 17, and stool screws, exhibit No. 18. At trial, Beutlespacher, plaintiff and Parala identified exhibit No. 17, by appearance, as the stool in question.

At trial, defendants disputed the identity of exhibit No. 17 as the stool on which plaintiff was injured. Kenneth Emmert, Midwest's maintenance supervisor, testified that he saw the stool in Beutlespacher's office, that it was an Interroyal single-wall construction design, that its metal back was still attached, that one of its leg extensions was telescoped into the stationary portion of the frame, and that some of the leg extension screws were partially backed out. Emmert also testified that in May 1977, at Midwest's office, he saw a stool with a tag referring to plaintiff and Interroyal. Beutlespacher denied that there ever was a tagged stool marked in connection with this case after he sent the stool to Interroyal the day after the accident. The jury answered in the affirmative a special interrogatory submitted by defendants asking whether exhibit No. 17 was the stool on which plaintiff was injured.

Defendants initially contend that the trial court's order *in limine* precluding evidence of misuse of the stool or change in its original condition by the employer was reversible error.

■ In responding to plaintiff's motion to preclude such evidence, defense counsel stated that if Midwest changed the original condition of the stool, that conduct would be a defense. When defense counsel refused to identify any such evidence, the trial court granted the motion but stated that if any such evidence surfaced defense counsel should bring it to the court's attention. Defense counsel agreed that he would. Clearly, the order precluding reference to employer misconduct where it appeared that no such relevant evidence existed was not an abuse of discretion, particularly in light of the court's willingness to reconsider the restraint upon defendants' identification of any such evidence. The trial court did not bar a "key" defense. We will not speculate as to what evidence, if any, was precluded and whether this evidence would have constituted reversible error.

■ Defendants next contend that the trial court erred in allowing evidence of subsequent design changes in the Interroyal 515 model stool. Defendants argue first that the trial court erred in denying their motion *in limine* to exclude evidence of subsequent designs B and C. Since evidence of post-occurrence design changes are admissible in strict liability cases as feasible alternatives to show the danger-

ous condition of the product in question (*Kerns v. Engelke* (1979), 76 Ill. 2d 154, 390 N.E.2d 859; *Sutkowski v. Universal Marion Corp.* (1972), 5 Ill. App. 3d 313, 281 N.E.2d 749), the trial court did not abuse its discretion in denying defendants' motion to exclude the evidence. Defendants also argue that the trial court erred in allowing plaintiff's expert witness, Irving Hazard, to testify that designs B and C were unreasonably dangerous. Defendants maintain that this testimony shows that designs B and C were not introduced to show feasibility, as originally argued in the hearing on defendants' motion, but to show Interroyal's wilful and wanton conduct, which they argue is inadmissible.

■ We note first that Hazard's testimony with respect to design C was that it was dangerous, not unreasonably dangerous. Design C was a dramatic improvement over the earlier designs because its nut and bolt system provided positive locking which would prevent the adjustments screw from falling out, the claimed defect. Although Hazard stated that design C still posed a danger because it failed to incorporate a better screw available in the market, this testimony did not impair the admissibility of design C as a feasible alternative. The evidence of design C, including Hazard's testimony, was properly admitted as a feasible alternative.

■ With regard to Hazard's testimony that design B was unreasonably dangerous, the trial court properly admitted it to show wilful and wanton misconduct. Although defendants rely upon the rule that post-occurrence modifications may not be introduced to show negligence (*Sutkowski v. Universal Marion Corp.* (1972), 5 Ill. App. 3d 313, 281 N.E.2d 749; *Lundy v. Whiting Corp.* (1981), 93 Ill. App. 3d 244, 417 N.E.2d 154), we believe their reliance is misplaced. While post-occurrence changes are insufficiently probative of a manufacturer's prior neglect, in this case, evidence of design B, including Hazard's testimony that it was unreasonably dangerous, was probative of a course of conduct engaged in by Interroyal which was wilful and wanton. This design B testimony was relevant to prove that Interroyal, knowing of the specific defects in design A, failed to correct them even though the defect could have been cured easily. It was not until 1977 when Interroyal introduced design C that it produced a product which was not unreasonably dangerous. This evidence tended to show that Interroyal acted with conscious disregard for the safety of others.

Moreover, despite Interroyal's sworn identification of exhibit No. 17 as the stool on which plaintiff was injured, defendants disputed the stool's identity at trial. They introduced evidence that the boxes in

which the stools were shipped to Midwest contained no markings and that Killian sent the "current design." Although exhibit No. 17 was a design A model, the jury could have believed that some boxes shipped were design B stools. Thus, the evidence regarding design B was admissible to show that plaintiff's injuries were caused by an unreasonably defective stool.

While we do not believe there was any error in admitting evidence that designs B and C were unreasonably dangerous and dangerous respectively, we find that any error in the admission of this testimony is harmless. Moreover, any such error does not affect the admissibility of designs B and C because both designs were also admissible to impeach Dadourian. He testified that Interroyal had received no complaints about its stools. The engineering change orders detailing the design modifications identified as designs B and C revealed that the nature of and reason for those changes were due to field complaints.

■ Defendants further contend that the trial court abused its discretion in allowing Painter to testify for plaintiff as an expert witness because he had not been identified before trial as a witness. We do not agree. Defendants were given the opportunity to depose Painter and to obtain a transcript of his deposition before he testified. (See *Urman v. Walter* (1981), 101 Ill. App. 3d 1085, 428 N.E.2d 1051.) The lack of any prejudicial surprise is further supported by the fact that Painter's testimony was based upon a report given to Interroyal in 1973 in connection with the Mix litigation.

■ Defendants also maintain that it was error to allow Painter to testify regarding his participation in the Mix case because there was no substantial similarity between the two cases. The record reflects, however, that in both cases a single-wall model stool collapsed due to a design defect in the leg adjustment connector mechanism, causing plaintiff to sustain injuries. This substantial similarity is not belied by the fact that the screws on the sample stool Painter examined had been welded in place. Painter directed his analysis to the design of the connector mechanism in the single-wall model stool, a design identical to plaintiff's exhibit No. 17 and which did not include the welding of screws. Nor is it relevant that Painter's method of evaluation did not consist of laboratory physical tests. Painter properly was allowed to testify as an expert about his opinion of the leg adjustment connector device in the single-wall model.

■ Defendant also argues that the trial court abused its discretion in the admission and exclusion of certain medical testimony from Dr. Trafimow. He was an orthopedic surgeon who performed surgery

on plaintiff and discovered that she had a herniated disc and permanent damage. The trial court's decision to allow Dr. Trafimow to help plaintiff's counsel formulate a question was a matter of expediency and was not prejudicial. The question ultimately asked was whether in the doctor's opinion there was anything which could be done in the future to improve plaintiff's condition. Dr. Trafimow's answer that fusion surgery could help was not speculative but rather predicated upon reasonable medical certainty. Nor did Dr. Trafimow's subsequent testimony that such surgery was not on the horizon remove from his prior answer the reasonable certainty regarding fusion surgery. This statement, when read in context with the doctor's complete testimony, indicates that such surgery was not in plaintiff's immediate future, but was reasonably certain to occur. We also find no evidence of any undue restriction of defendants' cross-examination of plaintiff or Dr. Trafimow regarding plaintiff's prior injuries. Both witnesses were cross-examined thoroughly and vigorously. The trial court properly sustained objections to several questions asked of Dr. Trafimow about plaintiff's history and prior injuries because of the form of the questions.

■ Defendants also contend that plaintiff failed to prove the essential elements of her products liability case. To recover in a product liability action, plaintiff must prove that the injury resulted from a condition of the product, that the condition was unreasonably dangerous, and that the unreasonably dangerous condition existed at the time the product left defendant's control. (*Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182.) Here, the testimony of plaintiff and Parala demonstrated that plaintiff was injured when the leg of a stool telescoped, causing the stool to collapse while plaintiff was sitting on it. Despite conflicting evidence, the jury's finding that exhibit No. 17 was the stool on which plaintiff was injured finds ample support in the record. Exhibit No. 17 was an Interroyal stool with a single-wall construction leg adjustment connector mechanism, and all Interroyal stools delivered to plaintiff's employer were single-wall construction design stools. Testimony adduced by plaintiff showed that a stool with this single-wall construction design is unreasonably dangerous because of the absence of a reliable locking device in the leg connector mechanism, thereby rendering the stool likely to collapse. The evidence of the nut and bolt design, design C, presented as a feasible alternative design, further supports the unreasonably dangerous condition of the stool. Furthermore, exhibit No. 17 showed no signs of abuse, misuse, or product modification. The above evidence was ample to show that plaintiff's injury resulted from a design de-

254

fect, that the design defect was an unreasonably dangerous condition in the stool, and that this condition existed at the time the stool left defendants' control.

Defendants also argue that improper jury instructions resulted in an excessive award of damages. They urge that plaintiff's jury instructions regarding future medical expenses and future loss of income were not supported by the evidence.

■■ Dr. Trafimow testified that plaintiff suffered permanent nerve injury which affected her lower back, her left buttock and her left leg. Dr. Trafimow found visible signs of atrophy in her left leg. He stated that plaintiff's injury will continue to cause her to suffer future pain and that her injury will require future medical supervision. Although not planned in the foreseeable near future, he was reasonably certain that plaintiff would need fusion surgery to improve her condition. Plaintiff testified regarding the continual pain she has experienced since her injury. Her injury has affected her ability to secure employment. No longer able to perform heavy physical jobs for which she was employed in the past, plaintiff changed jobs and incurred an earnings loss of approximately $25 per week. We believe the foregoing evidence was sufficient to justify the giving of instructions on future medical costs and future loss of income. (*Young v. Gateway Transportation Co.* (1975), 26 Ill. App. 3d 864, 326 N.E.2d 222; *Jackson v. Illinois Central Gulf R.R. Co.* (1974), 18 Ill. App. 3d 680, 309 N.E.2d 680.) We find further that the jury verdict was not the result of any prejudicial error in the instructions regarding wilful and wanton conduct, imputed liability, and circumstantial evidence.

■■ Defendants also contend that the trial court committed reversible error in excluding certain testimony of Ralph Barnett, defendants' expert witness. Barnett was precluded from testifying about the material strength of the single-wall system on the grounds that it was irrelevant and that it was barred by prior court orders. Barnett's strength analysis findings and opinions, which were prepared and documented during trial without notice to plaintiff, violated both a reciprocal order *in limine* preventing Barnett and plaintiff's expert witness Hazard from testifying about opinions, tests and findings not mentioned in their discovery depositions and a prior order requiring that all tests be completed 72 hours before the beginning of trial. It was not an abuse of discretion to preclude Barnett's testimony on this issue. *Carlson v. General Motors Corp.* (1972), 9 Ill. App. 3d 606, 289 N.E.2d 439.

■■ Defendants also maintain that the conduct and remarks of the trial judge deprived them of a fair trial and that the trial judge

was not evenhanded in several of his rulings. Defendants first point to the refusal of the court to listen to their offer of proof regarding Barnett's excluded testimony. Although Barnett's testimony may have demonstrated its relevancy to this case, nothing in the content of the offer of proof could overcome the fact that it violated prior court orders.

Nor do we find any bias in the trial court's ruling precluding Barnett from testifying about findings from certain vibration tests he ordered. Barnett did not perform or witness the tests, and the film that he reviewed did not show the result witnessed by Mitchell Kaplan, the man who conducted the test. The film did not contain the loosening and displacement of one of the screws during the vibration test. The court ruled that Barnett could testify about the vibration studies once the necessary foundation had been established by Kaplan. Court was adjourned so that Kaplan's deposition could be taken, but after his deposition Kaplan was not called as a witness. Absent this foundation testimony, Barnett was thereafter properly precluded from testifying about these studies.

The fact that Hazard was allowed to comment upon tests run by Barnett, while Barnett's testimony about tests conducted by Hazard was stricken, does not demonstrate bias. Barnett's commentary upon Hazard's tests was stricken, because Barnett had mischaracterized Hazard's testimony. Defendants were not precluded from thereafter inquiring about Hazard's tests, but this line of questioning was dropped.

Nor did the trial court err in excluding a photograph of a design B stool or in precluding certain testimony relating to an exhibit introduced for demonstrative purposes only. An adequate foundation had not been laid for the introduction of either item.

We have considered other trial court rulings cited by defendants, and we find that any error in these rulings was harmless. Similarly, we find defendants were not prejudiced by the court's conduct in questioning Haig Dadourian. Throughout the trial, the trial court questioned witnesses of both parties alike. Additionally, the isolated comments of the trial court during this three-week trial fail to demonstrate prejudicial error warranting reversal.

■ Defendants further assert that certain comments and conduct of plaintiff's counsel during trial constituted reversible error. The record reveals that this case was tried vigorously by both parties and that the conduct of both counsel at times was less than ideal. We find, however, that none of the conduct or comments of plaintiff's counsel during trial, including closing argument, merit reversal.

■■ Interroyal also contends that the punitive damages award is not supported by the evidence. Specifically, Interroyal maintains that it was prejudicial error to admit evidence of other lawsuits, that the evidence failed to show either a deliberate corporate participation in a wrongful act or a duty to warn or recall the stool, and that Interroyal's conduct did not constitute a conscious disregard for the safety of others.

Punitive damages based on wilful and wanton conduct are allowed in product liability actions where there is evidence of conscious disregard for the safety of others. (*Moore v. Jewel Tea Co.* (1969), 116 Ill. App. 2d 109, 253 N.E.2d 636, *aff'd* (1970), 46 Ill. 2d 288, 263 N.E.2d 103.) The essential elements of wilful and wanton conduct in a product liability case include knowledge of the defect, knowledge or notice that the defect was likely to cause injury and failure to warn of or remedy a known defect or take some other affirmative action to avoid the injury. *Moore v. Jewel Tea Co.* (1969), 116 Ill. App. 2d 109, 253 N.E.2d 636.

Interroyal first argues that the admission of evidence of other lawsuits listed in its interrogatory answer was prejudicial error because plaintiff failed to demonstrate the substantial similarity between those cases and the present one. Evidence of substantially similar prior lawsuits against defendant are admissible to show that defendant had notice of the defect before plaintiff was injured. (*Rucker v. Norfolk & Western Ry. Co.* (1979), 77 Ill. 2d 434, 396 N.E.2d 534.) Contrary to Interroyal's assertion, the cases read to the jury were substantially similar to the case before us.

The cases were listed in Interroyal's sworn response to plaintiff's interrogatory regarding lawsuits against Interroyal that specifically alleged a defect in the locking device of the leg extension on Interroyal model 515 stools. The directive wording of this interrogatory, explicitly limiting Interroyal's answer to only those lawsuits in which the cause of injury was the defective condition of the leg extension connector mechanism, clearly satisfied the substantial similarity requirement enunciated in *Rucker*. Any error in plaintiff's reading into evidence three suits filed against Interroyal in 1975 after plaintiff's injury but before she filed suit is cured by Interroyal's failure to object, and is harmless since there were four other cases which were filed before plaintiff was injured.

■■ Additionally, the substantial similarity between the Mix case, one of the listed lawsuits, and the present one was firmly established in the record. Because of this similarity the trial court did not err in admitting documents related to the Mix case. The documents included

Painter's report to his employer, Snyder Research Laboratory, containing his findings after examining the stool, the Snyder report including Painter's conclusions, and a letter to Interroyal regarding this report. These documents further demonstrate Interroyal's prior notice of the defect in the design of the single-wall model stool.

Furthermore, the record contains additional evidence demonstrating notice. In June 1973, 18 months before plaintiff's injury and nine months before the single-wall stool was shipped to Midwest, the single-wall design was replaced by a double-wall construction design. Two engineering change orders revealed that the design of the stool was changed "to strengthen the union of the leg assembly" and "to eliminate field complaints." Dadourian denied there were any complaints about the stool but then, when confronted with the statements in the engineering reports, admitted their existence. The jury could infer from this evidence that Interroyal had actual notice of the leg connection defect in its design A stool.

Thus, there was ample evidence for the jury to believe that Interroyal had knowledge of the defect that could and did injure other stool users, and therefore Interroyal had a duty to remedy and warn of the known dangers. There was also sufficient evidence to show deliberate corporate participation in the wrongful act. Interroyal made no attempt to take steps to remedy the defect or to issue warnings. The jury heard evidence that design C was a feasible alternative to design A and that design A stools could have been remedied inexpensively. Instead, as indicated in the engineering change order documents, Interroyal executives ordered that the old design A stock be used up rather than modified.

█ A manufacturer is held to the degree of knowledge and skill of experts in the design of its products. (*Dunham v. Vaughan & Bushnell Manufacturing Co.* (1967), 86 Ill. App. 2d 315, 229 N.E.2d 684.) Interroyal's expertise involves the design and manufacture of a stool, a product which makes the user very dependent upon the structural support of the stool. Interroyal's decision to place into the stream of commerce, without modification or warning, a stool known to be defective and to have caused injury, clearly demonstrates a conscious disregard for the safety of others. The jury's verdict finding Interroyal guilty of wilful and wanton conduct is supported by the evidence.

Regarding the amounts of both verdicts, the determination of an adequate award of damages is peculiarly within the province of the jury and great weight is given to that determination. A jury verdict will not be disturbed unless all reasonable persons would agree that

the amount is excessive. (*Bender v. Consolidated Mink Ranch, Inc.* (1982), 110 Ill. App. 3d 207, 441 N.E.2d 1315.) We do not find the award of $200,000 for compensatory damages or the award of $100,000.50 for punitive damages to be excessive.

Although the trial was not free from error, we believe that none of the errors either alone or cumulative constitute prejudicial error. Our careful examination of the large record indicates that defendant received a fair trial. There is substantial evidence to support the jury verdicts, and the judgment entered thereon.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

McGILLICUDDY and WHITE, JJ., concur.