ARTHUR ELLIOTT, Plaintiff-Appellant, v. SEARS, ROEBUCK & COMPANY, Defendant-Appellee (Emerson Electric Company, Defendant).

Fourth District   No. 4—87—0596

Opinion filed July 28, 1988.

John F. Martin, of Dukes, Martin, Helm & Ryan, Ltd., and Jeffrey K. Clapper, of Clapper & Clapper, P.C., both of Danville, for appellant.

Michael R. Cornyn, of Thomas, Mamer & Haughey, of Champaign, for appellee.

JUSTICE SPITZ delivered the opinion of the court:

This appeal involves a products liability action for personal injuries against defendant Sears, Roebuck and Company, the seller of a Craftsman ACCRA-Arm 10-inch radial saw, model No. 11329410. Plaintiff Arthur Elliott had four fingers of his right hand amputated when the saw "kicked back" while plaintiff was using it to cut wood, thereby bringing the blade into contact with plaintiff's hand. This injury occurred on May 3, 1983.

The saw was manufactured by Emerson Electric Company in November 1965. It was then sold and shipped to defendant within one month after its manufacture. Plaintiff purchased the saw from defendant in early 1982.

Plaintiff filed suit against defendant on July 11, 1984. Emerson was later added as a party-defendant, but the strict liability count against Emerson was dismissed on the ground that suit was not initiated within the period required by the statute of repose. (Ill. Rev. Stat. 1985, ch. 110, par. 13—213.) The remaining counts against Emerson were also dismissed at a later time.

The three counts against Sears were couched in the language of strict liability, negligence, and wilful and wanton misconduct. In its second affirmative defense to count I, Sears (defendant) raised the statute of repose as an affirmative defense.

Plaintiff filed a motion to strike defendant's second affirmative defense to count I, which was denied. Defendant then filed a motion for summary judgment on count I based on the failure of plaintiff to bring the action within the period set out in the statute of repose. The trial court granted the motion for summary judgment on count I. Thereafter, the cause proceeded to trial against defendant on the negligence and wilful and wanton theories.

At the conclusion of plaintiff's case in chief, the trial court directed a verdict in favor of defendant on the wilful and wanton count. Subsequently, the jury returned a verdict in favor of defendant on the negligence count and judgment was entered thereon.

Plaintiff's appeal involves three issues. First, does the statute of repose bar a strict liability action against defendant under the facts of this case? Second, is the verdict in favor of defendant on the negligence count against the manifest weight of the evidence? Third, did the evidence before the court at the time of considering the defendant's motion for a directed verdict as to the wilful and wanton counts,

when viewed in a light most favorable to plaintiff, so overwhelmingly favor defendant that no contrary verdict could ever stand? In light of these results, the evidence presented at the trial relevant to these issues must be reviewed.

The plaintiff testified about his education and prior job experience and his experience with woodworking, including his use of power tools. Two of plaintiff's sons also testified as to plaintiff's experience in using a variety of tools and at various construction projects. Neither of these witnesses was present when plaintiff was injured, however. Plaintiff stated he had never used a radial arm saw before he bought the one in issue from defendant's store in Danville, Illinois, in March or April 1982.

At the time of purchasing the saw, plaintiff went to the store in response to an ad he saw in a local newspaper. When he arrived at the store, he saw the model he wanted sitting on the floor on display and told the salesman that was the saw he wanted to buy. He recalls paying about $190 cash. There were other radial arm saws on sale beside the model he purchased, but he told the salesman he wanted the cheapest saw they had. No one demonstrated the saw for him and no one warned him about kickbacks. When he picked up the saw at the delivery door behind the cart, it was in a box. The saw required some assembly. Plaintiff did that himself.

On the day he was hurt, he was ripping four-foot long one-by-fours. He described how he was positioned at the saw and explained how he set up the saw. He testified that while he was pulling one of the boards through the saw with his right hand, the board kicked back to the left very quickly and his fingers on his right hand were cut off.

On cross-examination, plaintiff testified that when he took the saw out of the box, he was satisfied that it was the same saw he told the salesman he wanted. It came out of a sealed box that did not appear to have been opened before. The instruction manual that came with the saw told him how to put it together, how to use it, and how to use it when ripping lumber. He read it approximately three times before he got hurt although not on the day he got hurt. He was confronted with a prior statement in his deposition wherein he stated he had only read the instruction booklet on the date he got it and not thereafter. He set the saw up in such a way that the only way to operate it was in front of the saw. He did not provide room at the side of the saw because he had placed a table there. He testified that if the saw was set up in the "in-rip position" it would have been much more difficult to operate because he could not stand on the side of the saw.

He did not remember where the instruction booklet suggested he was to stand if he was doing an "in-rip" cut. He did not remember if the instruction booklet told him to use "in-rip" position to rip four-inch-wide wood. He was not using a push stick on the day in question nor did he ever use a push stick. He knew that the purpose of a push stick was to keep his fingers out of the saw. He did not remember ever reading anything in the instruction booklet about using a push stick. He did not use a square to align the saw blade on the day in question. He did not use a square to align the fence. He testified that the anti-kickback pawl was set.

The directions in the manual on operating the saw in the "in-rip position" were read to the plaintiff, and he testified he understood them. The instruction booklet direction on "out-ripping" was read to the plaintiff, and he testified he understood it. The direction in the instruction booklet indicating the use of a push stick was read to the plaintiff, and he testified he understood it.

He testified that just before the board kicked back, he was holding it with his right hand with just a light touch. When the board kicked back, it split down the middle.

Plaintiff was asked if the saw which was in the courtroom looked the same as it did when he owned it. He testified there had been some changes, including that it was very rusty and when he had it, it was shiny. He also testified that there was a switch on the top of the saw that was different. Everything else looked the same as it was when he got it. He never had it serviced for maintenance. He never changed a thing.

Plaintiff called an expert witness, Professor Joseph ElGomayel, a professor of industrial engineering at Purdue University. He testified he was aware the plaintiff had purchased the saw in 1982. He examined the saw in question as well as various instruction booklets and manuals from that saw, other Craftsman saws and one Black and Decker saw. The approximately 32 manuals he reviewed were dated between 1965 and 1986. He testified that, in his opinion, the "kickback device" was not designed for safe operation. He was critical that the saw did not have a "spreader." The purpose of the spreader is to keep open the "kerf," or the slot in the wood which is made by the saw when cutting. He testified that other saws sold in 1982 by Sears had spreaders on them but that the one in question did not. He was also critical of the design of the anti-kickback pawl because it was hexagonal and could be turned in a number of different positions, only one of which was the correct position.

Professor ElGomayel was critical of the instruction manual in that

it did not warn of the dangers of a kickback, it did not have a picture of the operation of the saw in the out-rip position, and it did not give a graphic indication of how to set the kickback pawls. The professor identified American National Standard Institute (ANSI) standards from 1954, reaffirmed in 1961, and ANSI standards issued in 1975 that related to radial arm saws. He read several of the standards to the jury which concerned a spreader, anti-kickback pawls, and the causes of kickbacks. The witness expressed his opinion that defendant was negligent in selling the saw in 1982 when it was not in compliance with the ANSI standards.

On cross-examination, Professor ElGomayel testified that his expertise was in manufacturing and not in retail trade. The only information he had that the saw was sold to the plaintiff in 1982 was from the plaintiff. He knew the saw was manufactured in 1965 by Emerson Electric, and he admitted that the 1954 standards to which he had earlier referred advised that a spreader "should be provided" and that the word "should" indicated that it was not mandatory. In 1975, the ANSI standard made the spreader mandatory. He testified that from his review of various manuals, he determined that as late as 1969 there were saws being manufactured without spreaders. The first time he found a manual which incorporated a circular spreader design, which he had testified was the best design, was 1975. He admitted that technology was changing in the period of around 1966. He did not know what technological problems existed in 1965. He admitted that the knife spreader which was being used around 1969 on some saws required considerable judgment by the operator of the saw.

When asked about the "scope" of the 1975 ANSI standards, he read the relevant section to the jury. He admitted that those standards did not specify within the "scope" section that they applied to a retailer, although it was his opinion they did. He agreed that the standards did indicate they applied to installation, operation and maintenance of the saw.

He testified he was not familiar with standard UL 987 (American National Safety Standards for Stationary and Fixed Electrical Tools, c 33.86—1972) and did not know if it applied to this saw. Regardless of the fact he had not read those standards, he held the opinion that the manufacturer and the seller of this particular radial arm saw should have abided by the standards published by ANSI.

However, this witness did not think a circular spreader was technologically possible in 1965, but it was available in 1982. The criticism he had of the blade guard did not have anything to do with the injury

in this case and he did not have any problem understanding the directions in the book as to setting up the anti-kickback pawls or in following "Figure 27" in the booklet, which shows how the pawls are to be set up. He acknowledged that according to the instruction booklet when one was using the saw in the "in-rip position" the operator was to stand on the right side of the table and that the instruction booklet recommended the in-rip position when ripping boards up to $8^7/8$ inches wide. The out-rip position should be used only when the width of the ripped board cannot be cut in the in-rip position. He testified that when the plaintiff was ripping a four-inch board, the manual suggested he use "in-ripping." However, the plaintiff was using the saw in the "out-rip position." He agreed that if the plaintiff had been using a push stick as recommended by the instruction booklet, it would have been "less likely" that he would have been injured.

This witness stated he had first used a radial arm saw about two weeks before the trial. At that time, he used a Black and Decker saw and he did not read the manual before he used the saw.

Professor ElGomayel testified the plaintiff had the "anti-kickback pawl" device set up incorrectly. He also testified that, to a reasonable degree of engineering certainty, the lack of the spreader on the saw caused the kickback. However, he admitted the kickback could have happened even if the spreader was on the saw. There would have been a kickback if the fence was not square with the saw blade. He criticized the placing of a new blade on the saw without squaring it. He also stated that if plaintiff had only a light touch on the board, it would have been less likely that his hand would have been drawn back with the board when it kicked back.

■■ Since the trial court directed a verdict on the wilful and wanton count at the close of plaintiff's evidence, it seems appropriate to consider the propriety of the trial court's ruling at this time after all the evidence presented by plaintiff as to defendant's culpability has been set forth. The question of whether alleged misconduct by a party is wilful and wanton is generally a question of fact for the jury. (*Murphy v. Jewel Cos.* (1974), 24 Ill. App. 3d 1, 320 N.E.2d 47.) Nevertheless, the trial court may remove such questions of fact from the jury by directing a verdict when all the evidence, viewed most favorably to the nonmoving party, here the plaintiff, is so overwhelmingly in favor of the moving party that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) This does not mean the existence of some evidence favoring plaintiff will defeat the directed verdict. Evidence supporting the nonmovant may fade in significance when re-

viewed in light of all the proof, rendering only one verdict possible. (*Roedl v. Lane* (1976), 41 Ill. App. 3d 1062, 355 N.E.2d 354.) As was stated in *Collins v. Interroyal Corp.* (1984), 126 Ill. App. 3d 244, 256, 466 N.E.2d 1191, 1199:

> "The essential elements of wilful and wanton conduct in a product liability case include knowledge of the defect, knowledge or notice that the defect was likely to cause injury and failure to warn of or remedy a known defect or take some other affirmative action to avoid the injury."

■ Plaintiff contends defendant flagrantly disregarded the consumer public's safety by offering for sale this particular saw in 1982 in spite of the fact it failed to meet the most recent ANSI design standards. However, plaintiff has cited no cases which hold the failure to meet these standards establishes a *prima facie* case for wilful and wanton misconduct. Furthermore, plaintiff presented no evidence that defendant, by its officers, employees, or agents, had knowledge of any defect or that this particular saw failed to meet the ANSI standards. Nor was there evidence the defendant had knowledge the saw, as it was designed and sold, was likely to cause injury. Therefore, the trial court properly directed a verdict as to the wilful and wanton count.

■ Although the negligence count went to the jury, plaintiff asks this court to overturn that verdict as well, suggesting the verdict in favor of defendant was against the manifest weight of the evidence. The standards for review of a jury verdict were summarized in *Bautista v. Verson Allsteel Press Co.* (1987), 152 Ill. App. 3d 524, 530, 504 N.E.2d 772, 776:

> "A jury verdict should not be set aside merely because the jury could have drawn different inferences and conclusions from conflicting testimony. (*Turner v. Chicago Transit Authority* (1984), 122 Ill. App. 3d 419, 425, 461 N.E.2d 551.) Only if the verdict was palpably erroneous and wholly unwarranted (*Frankenthal v. Grand Trunk Western R.R. Co.* (1983), 120 Ill. App. 3d 409, 415, 458 N.E.2d 530), was clearly the result of passion or prejudice (*Ogg v. City of Springfield* (1984), 121 Ill. App. 3d 25, 42, 458 N.E.2d 1331), or appears to be arbitrary, unreasonable, and not based upon the evidence will it be overturned (*Martin v. Zucker* (1985), 133 Ill. App. 3d 982, 990-91, 479 N.E.2d 1000)."

This reviewing court will not substitute our judgment for the judgment of the jury. (*Waterford v. Halloway* (1986), 142 Ill. App. 3d 668, 491 N.E.2d 1199.) It is the function of the jury to consider conflicts in evidence, controverted facts and the demeanor and credibility of wit-

nesses. This function does not devolve to the reviewing court, and therefore, unless there is no evidence which fairly tends to support the jury's verdict, a court of review will not disturb the verdict. (*Zelinski v. Security Lumber Co.* (1985), 133 Ill. App. 3d 927, 479 N.E.2d 1091.) As a result, when one party seeks to overturn a jury's verdict, claiming it is against the manifest weight of the evidence, a reviewing court will consider the evidence in the light most favorable to the party in whose favor the jury returned the verdict. *Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 476 N.E.2d 1232.

■ In response to the evidence presented by plaintiff, defendant presented three witnesses. Martin Conneally testified that he was an employee of defendant and that he had looked at the saw in question. He testified that there were several parts on plaintiff's saw which were not original parts on the saw sold by defendant. Those parts included the crank arm, a switch, and a wing nut which secured the blade guard. He identified those parts in the schematic drawings and indicated a distinctly different shape from the original, die-cast crank than that of the crank which was on the saw. He similarly testified concerning the drawings for the switch and the wing nut.

Thomas Mullins identified himself as the operating manager of defendant's store in Danville, Illinois. He was in that position in 1982 and has been working in that store since 1976. He testified he reviewed yearly inventories for the store for fiscal years 1973 through 1983, which inventories listed the merchandise on hand as of January for the fiscal year preceding. He reviewed inventory sheets for fiscal years 1973, 1976, 1977, 1978, 1979, 1981 and 1983. The inventories for the years 1974, 1975, 1980, and 1982 were missing. The normal retention period for inventory sheets was four to five years and he did not know where the missing inventory sheets were. When he checked the inventory sheets, he looked for the stock number of the saw in question. He obtained the stock number and model number from the number that was on the instruction booklet that the plaintiff testified came with the saw. This stock number did not appear on any of the inventory lists he reviewed, even though the inventory sheet for fiscal year 1981 was prepared in January 1982, just a few months before plaintiff testified he bought the saw.

Professor Harrison Streetor, a professor of general engineering at the University of Illinois, testified the Underwriters Laboratories Standard for Safety, UL 987, applied to a radial arm saw marketed for home use. The standard became effective on June 23, 1983, and the saw was in compliance with UL 987. The ANSI standards from 1954 and 1975 were not directed to the manufacturers of radial arm

saws intended for sale in the home-use market, but were instead directed to the industrial market. The lack of a spreader, which Professor ElGomayel had testified was a defect, had nothing to do with the accident that the plaintiff described. In the opinion of this witness, there are a number of factors which might have caused this incident to occur, including improper alignment of the saw blades and the fence, plaintiff using the out-rip instead of the in-rip position, not using a push stick, and improper hand position on the board. The instruction booklet explained how to align the saw properly with the fence, and gave adequate instruction to the user as to how to operate the saw and how to set the anti-kickback pawl.

According to this witness, the plaintiff did not follow the instructions in aligning the saw and failed to stand in the proper position as indicated in the instruction booklet. He testified it was not the purpose of the anti-kickback pawl to prevent a kickback altogether. He was unaware of any design of an anti-kickback pawl that could totally prevent a kickback.

In this case, the jury could simply have believed defendant's witnesses and disregarded those of the plaintiff. There is clearly sufficient evidence to support the jury's verdict in favor of defendant on the negligence count, and it will not be disturbed on review.

■ Last, we consider the issue of the trial court's granting of summary judgment in favor of defendant based on the statute of repose for product liability. (Ill. Rev. Stat. 1985, ch. 110, par. 13—213.) The relevant portions of that statute are as follows:

> "(b) Subject to the provisions of subsections (c) and (d) no product liability action based on the doctrine of strict liability in tort shall be commenced except within the applicable limitations period and, in any event, within 12 years from the date of first sale, lease or delivery of possession by a seller or 10 years from the date of first sale, lease or delivery of possession to its initial user, consumer, or other non-seller, whichever period expires earlier, of any product unit that is claimed to have injured or damaged the plaintiff, unless the defendant expressly has warranted or promised the product for a longer period and the action is brought within that period.
>
> * * *
>
> (d) Notwithstanding the provisions of subsection (b) and paragraph (2) of subsection (c) if the injury complained of occurs within any of the periods provided by subsection (b) and paragraph (2) of subsection (c), the plaintiff may bring an action within 2 years after the date on which the claimant knew, or

through the use of reasonable diligence should have known, of the existence of the personal injury, death or property damage, but in no event shall such action be brought more than 8 years after the date on which such personal injury, death or property damage occurred." (Ill. Rev. Stat. 1985, ch. 110, par. 13—213.)

The nature of the statute of repose was discussed in *Thornton v. Mono Manufacturing Co.* (1981), 99 Ill. App. 3d 722, 726, 425 N.E.2d 522, 525:

"Strictly speaking, however, the statute here is not a true statute of limitation, which governs the time within which lawsuits may be commenced *after* a cause of action has accrued. [Citation.] Rather than being directed at the remedy, this statute extinguishes the right of action itself *before* it arises. The significance of this distinction was explained by the Supreme Court of New Jersey in *Rosenberg v. Town of North Bergen* (1972), 61 N.J. 190, 293 A.2d 662. There, the plaintiff challenged the constitutionality of a 10-year statutory limitation upon actions arising from deficiency in the design, planning, supervision or construction of improvement to real property. Plaintiff sought to recover for personal injuries allegedly sustained as a result of negligence in the repavement of a public street 34 years prior to the date of her injuries. Rejecting plaintiff's claim that the statute deprived her of due process in that it barred her cause of action before it accrued, the court stated:

'This formulation suggests a misconception of the effect of the statute. It does not bar a cause of action; its effect, rather, is to prevent what might otherwise be a cause of action, from ever arising. Thus injury occurring more than 10 years after the negligent act allegedly responsible for the harm, forms no basis for recovery. The injured party literally has *no* cause of action. The harm that has been done is *damnum absque injuria*—a wrong for which the law affords no redress. The function of the statute is thus rather to define substantive rights than to alter or modify a remedy. The Legislature is entirely at liberty to create new rights or abolish old ones as long as no vested right is disturbed. [Citations.]' 61 N.J. 190, 199-200, 293 A.2d 662, 667.)" (Emphasis in original.)

In *Thornton*, the injury occurred more than 10 years after the first sale of the rotary cutter to the initial consumer. The *Thornton* opinion does not indicate the date of manufacture of the rotary cutter,

and therefore that must not have been a consideration in the *Thornton* case. The court in *Thornton* concluded:

"However, where the language of a statute is certain and unambiguous, the only legitimate function of the courts is to enforce the law as enacted by the legislature. (*Certain Taxpayers v. Sheahen* (1970), 45 Ill. 2d 75, 256 N.E.2d 758.) Although the provisions of this statute are complex, it cannot be said that the language applicable to this suit is ambiguous. For as a threshold matter, the benefit of the savings clause in subsection (d) can be claimed only by parties whose injuries occurred 'within any of the periods provided by subsections (b) and (c)(2) hereof ***.' Plaintiff's did not." *Thornton*, 99 Ill. App. 3d at 729, 425 N.E.2d at 527.

We agree the statute is unambiguous. However, the facts of this case are different. Here, the saw was manufactured in 1965 and allegedly first sold in 1982. Injury occurred in 1983. Plaintiff brought suit against defendant within the two-year limitation period. The only question is whether plaintiff must satisfy only one or both of the time limits of subsection (b) of the statute of repose.

The statute uses "or" in subsection (b). The action must be commenced not only within the limitation period, but also within 12 years from the first sale, etc., by a seller, including a manufacturer, *or* within 10 years of the first sale, *et cetera*, to the product's initial user, consumer or other nonseller, "whichever period expires earlier." So, if either of the 10- or 12-year periods has expired, then the action cannot be brought.

At least, that is true if subsection (b) is read alone. However, subsection (b) is expressly made subject to the provisions of subsection (d). The first phrase of subsection (d) states: "Notwithstanding the provisions of subsection (b)." "Notwithstanding" means "in spite of." (Webster's New Collegiate Dictionary 785 (1976).) Therefore, under the circumstances set forth in subsection (d), subsection (b) can be ignored.

In this case, we are interested in only one of those circumstances, since plaintiff suggests the first sentence of subsection (d) changes the meaning of subsection (b). Subsection (d) provides, if the injury occurs "within any of the periods" set out in subsections (b) and (c)(2), then the action can be brought within two years of the date plaintiff knew or reasonably should have discovered the injury, but in no event can the action be brought more than eight years after the injury occurred. By its very language, that portion of subsection (d) relied on by plaintiff applies only to those situations in which the injury is not immedi-

ately discoverable by the injured party. Eldredge & Houlihan, *Limitations of Action: Strict Liability in Tort—The Legislature Has Intervened*, 67 Ill. B.J. 214 (1978).) See, *e.g.*, *Costello v. Unarco Industries, Inc.* (1986), 111 Ill. 2d 476, 490 N.E.2d 675; *Rice v. Monsanto Co.* (1986), 145 Ill. App. 3d 1009, 496 N.E.2d 494.

In this case, there is no discovery problem. Plaintiff knew he was injured when the saw cut his hand on May 3, 1983. Subsection (d) has no application to the case at bar. Pursuant to subsection (b), the trial court properly entered summary judgment in favor of defendant as to the strict liability count.

For the foregoing reasons, the judgment of the circuit court of Vermilion County is affirmed.

Affirmed.

McCULLOUGH and KNECHT, JJ., concur.