## John W. Tumalty v. William C. Parker.

1. MALICIOUS PROSECUTION—*When an Arrest is Justifiable.*—P. let T. have a horse, buggy and harness to apply upon an indebtedness; T. took them and placed them in his own barn. P. subsequently borrowed them several times to take his family out riding, and afterward broke open the barn and surreptitiously took them away in the night time. It was held that his arrest for larceny upon the complaint of T. was justifiable.

2. LIENS—*Of Stable Keepers—Larceny.*—The keeper of a stable has a lien upon horses, carriages and harness for keeping, and if the owner breaks open the stable and surreptitiously takes away such horse, buggy and harness, the keeper will be justified in prosecuting him for larceny.

3. END OF THE PROSECUTION—*How to be Shown—Admissibility of the Record.*—A discontinuance of the prosecution is to be shown by the record, but such record is admissible only for the purpose of showing that the prosecution complained of has come to an end, and nothing else.

4. PRACTICE—*Excluding Evidence Improperly Admitted.*—When improper evidence has been admitted over the objection of the opposing party, the mischief caused by its admission is not cured by subsequently excluding it. In actions for malicious prosecution, the rules as to the admission of evidence should be fully observed.

5. BURDEN OF PROOF—*In Actions for Malicious Prosecution.*—In an action for malicious prosecution the burden is upon the plaintiff to show by a preponderance of the evidence, not only that the defendant was actuated by malice in causing his arrest, but that he did not have probable cause for doing so.

6. MALICE—*Not to be Necessarily Inferred from a Want of Probable Cause.*—The existence of malice does not raise a presumption of want of probable cause, while from proof of want of probable cause, malice may, but is not necessarily to be inferred.

7. PROBABLE CAUSE—*In Actions for Malicious Prosecution.*—If there is probable cause for a prosecution, it is immaterial that such prosecution was actuated by malice and also immaterial that the accused was not only found not guilty, but was actually innocent.

8. SAME—*What is Sufficient as Probable Cause.*—Where the circum-

Tumalty v. Parker.

stances presented to a prosecutor are such as would induce in the mind of a cautious man a belief of the guilt of the party accused, no recovery can be had in an action for malicious prosecution, brought by the accused against the prosecutor.

**Trespass on the Case,** for malicious prosecution.  Error to the Circuit Court of Cook County; the Hon. JOHN GIBBONS, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1900.  Reversed and remanded.  Opinion filed February 21, 1902.

CUNNINGHAM, VOGEL & CUNNINGHAM and C. M. HARDY, attorneys for plaintiff in error.

PORTER B. COOLIDGE and COLLINS & FLETCHER, attorneys for defendant in error; COLLINS & FLETCHER, of counsel.

MR. JUSTICE WATERMAN delivered the opinion of the court.

This was an action for malicious prosecution.

Upon the trial in the court below, it appeared that the plaintiff therein, in November, 1893, had in his possession a horse, buggy and harness, and claimed to be owner thereof. The wife of plaintiff below was then, according to his statement, owing defendant below seventy-five dollars.    According to the testimony of Tumalty, Mr. Parker was owing him $411.50 for plumbing done by him upon houses owned by Mrs. Parker.    Plaintiff and defendant had been acquainted for some years.

Under this previous relationship, plaintiff, in the said November, drove this horse to defendant's shop, 2251 Cottage Grove avenue, and, according to the testimony of Parker, told him " how the mare had been abused; " " that he had no money," and asked Tumalty if he had a place where he, Parker, could put " the horse, buggy and harness," to which Tumalty replied " yes."

Parker says that he also told Tumalty the " trouble" he had.  The trouble seems to have been because of various business transactions and the persecution, as he terms it, and doubtless so told Tumalty, of various parties; about 175 suits had been begun against him; he had been arrested fifteen times; was under bonds for $12,000; the sheriff and officers were looking for him; his bond had been forfeited;

he was hiding; and he owed $60 to "Moore's Stables" for the board of the mare, and was out of funds.

Parker testifies, "I told Mr. Tumalty, if he was ready, he could go with me there to his barn," and he said, "Drive her round to Twenty-fourth and Prairie avenue; I don't want any one to see me with you;" that Tumalty gave him a key to the barn and told him that he would have to pay four dollars a week for the keep of the mare; that she remained there eight or nine weeks; that he drove the mare out every night for exercise; that in February, Tumalty, told him "for God's sake to take the mare out of the barn;" "that he was afraid he would get into trouble." That the detectives had been to his store to examine his horses and he did not want to get into trouble; "For God's sake, take her out."

Parker says he went to the barn that night; that a new lock had been put on and his key wouldn't fit, so he got a boy about twelve years old, pushed some boards back and the boy in; and the boy lifted the scantling that held the door; then he, Parker, took the horse, buggy and harness and drove over to the "Kentucky Stables," corner Paulina and Van Buren streets, where he left the property; that this was in December or February. He neither saw nor communicated with Tumalty until he was arrested, March 5th, Parker says a month to six weeks after he took the horse from Tumalty's barn. If the horse were placed in Tumalty's barn at a charge of $4 per week, Parker was, when he took it out, apparently owing Tumalty some $40 for its board.

Parker testified that afterward he told his (Tumalty's) man, that "I had her (the horse) safe planted; that was the word I used. I wasn't going to tell anybody where she was."

Tumalty testified:

"I did some work once for Mr. Parker or his family. At the time this horse was turned over to me Mr. Parker came over to my shop and called me outside, and after he got me outside he says, 'Tumalty, I want you to take a walk over here with me;' he says, 'I want to turn over a horse, my horse, buggy and harness, to you as a part of that

debt that I owe you out at Park Manor.' I didn't know where the horse was then, and we walked along Twenty-third street until we came to a blacksmith shop at 112 Twenty-third street, and he says to me, 'I haven't got any money, and I can't afford to keep this horse, and I may as well straighten up some of that debt.' And he said, 'How much are you going to give for him?' and wanted $300, but I told him no; that I could not afford to give him that much; I would give him $200; because the horse was all foundered and the buggy wasn't much account; so he says, 'All right.' And he drove from there over to my barn, in the alley between Michigan and Wabash (2311), in the rear, and I put the horse away, and Mr. Parker walked off down Wabash avenue and I went on back to the shop. I was talking to Mr. Parker about an indebtedness on some house I did for him in Park Manor. I did all the transactions with Mr. Parker, not with his wife. He wanted I should take that horse as part of the indebtedness.

The amount of the indebtedness at that time to me on the Parker account was $611.50. The $200 was credited to Mr. Parker on this account. I didn't see Mr. Parker for about a week; one evening, about six o'clock in the evening, I met Mr. Parker on the corner of Twenty-third and Cottage Grove avenue, and he said he was just going over to my place, and he says, 'I want to borrow the mare to take my wife riding; she has been sick;" and I said, 'All right;' so I walked over to the barn with him and told the man to hitch the mare up for him. Mr. Parker drove her out. I guess it was a week or two after that he again asked me to drive her out, and he drove her, I think, three times, but he always brought her back; he always asked me for permission. Every time that I knew he drove her he asked me for permission with the exception of once. I did not give Mr. Parker the keys or a key to be given to him, to my barn, at any time. There were no arrangements between Mr. Parker and me in regard to the renting of my barn. I did not agree with him that he was to pay one-third of my barn rent. No arrangement was made in regard to who should take care of the horse while it was in my barn; there was no arrangement made. My man that I hired took care of the horse. I drove that horse almost any time, may be two or three times a week in the day time; I usually drove down Michigan avenue and out on the drive. The first time I found out that the horse had been taken out without my permission was along about February 18th

or 19th; there was dry sweat on the horse. I accused the man in the barn, my driver, of driving the horse.

I told the man not to allow the horse to be taken out; to take a new lock and to lock the barn. I had my locks changed on my barn. The lock was changed about six to eight days before the horse was taken. The man told me the horse and buggy and harness was gone. I went over to the barn and the boards were torn off the barn door. The boards were lying in the alley; were broken off the door; it was the board that laps the two big doors. I did not then know who had taken them, and I had no idea who had taken them. I went down to the police station at Twenty-sixth street, and I reported there that somebody had stolen my horse, buggy and harness. I did not have any idea who took them then. The second day after that the man came over that slept in the barn; came over and told me that his brother told him that Parker had been there and broke into the barn and taken the horse, buggy and harness, and had driven away down the alley. Then I went to hunt up where I could find Parker; I went to the police and told them, but they didn't know where Parker was; I told the police that Parker had taken the horse because this young man told me so. Then for five or six weeks after that I was looking for Parker, but never could find him. I didn't know where Parker lived. I did work for him, but that was in '88 or '89. It was pretty hard to find out where he lived. He was not living in the same house in which he used to live. I couldn't find him in the directory. I was driving down South Park avenue one day and I saw Mr. Parker's boy have a little wagon and he was pulling another boy; half a block after I had passed him, I got out and tied my horse and watched that boy for pretty near an hour playing with the wagon in the street there, until finally he went into a house just south of Twenty-ninth street and I waited there to see whether he come out again or not, but he didn't come out. So I went there that evening to see whether I could see Mr. Parker around, or could see his wife out there, but I couldn't. And then I got this warrant out and went and told Kramer I thought I had him located, and we went down there in the evening and stayed from about half-past six until nine o'clock at night, and it was raining, and we stood across the street watching what we could see. Finally Mr. Parker came out, and Mr. Kramer went up to him and said, ' Mr. Parker, you are under arrest.' When we got on the car, Mr. Kramer asked him where the horse and buggy were; he said he wasn't going to tell; he

said he took it, but he said he wouldn't tell where it was, not if he died."

As to the circumstances under which the horse was placed by Parker in the barn of Tumalty, there was no corroboration of the testimony of either plaintiff or defendant below.

As before said, when, in the night time, Parker took the mare away, he was apparently owing Tumalty some forty dollars for her board, and if Parker were then her owner (see Charles v. Neigelsen, 15 Ill. App. 17, and Cox v. McGuire, 26 Ill. App. 315), Tumalty had a lien upon her for her keeping. Sec. 2, Chap. 82, R. S.

Under such circumstances the surreptitious taking and hiding of her in the night was larceny. Bishop's Crim. Procedure, Secs. 720, 721; Rex v. Woodward, 2 East P. C. 653; Rex v. Bird, 9 Car. & P. 44; Rex v. Wymer, 4 Car. & P. 391; State v. Harrison, 75 N. C. 203.

Testimony as to the treatment of Parker by officers when Tumalty was not present, and did not direct, encourage, promote, or, so far as appears, favor, was inadmissible as against Tumalty, and while admitted before the suit was discontinued as to Kramer and Aldridge, should only have been upon plain instruction to the jury that it was not applicable to the defendant Tumalty.

A mere remark of the trial judge which the jury may not have understood the force of, is not, in such a case as this, and as to such testimony, sufficient.

While it is true that a discontinuance of the prosecution is to be proven by the record, it is not the case that counsel may read to the jury or introduce the proceedings for the purpose of influencing their minds against the defendant by thus showing how greatly the plaintiff has been damaged. The record is introduced for the purpose of showing that the prosecution has come to an end and for nothing more. It is not admissible " for all that it is worth," i. e., can be made out of it by the plaintiff. Skidmore v. Bricker, 77 Ill. 164; Cleveland, C., C. & St. Louis Ry. Co. v. Jenkins, 75 Ill. App. 1-27.

Nor should the testimony have been admitted of the attempt by an attorney, in the presence of Mrs. Parker, to induce Tumalty to let Parker " come out on bonds," or "to reduce the bonds," and what the attorney then told Tumalty as to the condition of Parker's family. Tumalty had no power to let Parker out or to reduce his bonds, or to dismiss the proceeding against him. The court, first over Tumalty's objection, admitted this testimony, and. afterward excluded it.

The mischief had been done, and as to such evidence in such case as this, it could not be repaired by mere after-exclusion. In actions for malicious prosecution, the rules as to admission of evidence should be fully observed. Brown v. Smith, 83 Ill. 291.

The case seems to have been tried in an irregular manner. Over the objections of the plaintiff below, the defendants below ought not, during the introduction of plaintiff's case in chief, to have been permitted to introduce in evidence notes, mortgages and bills of sale. The plaintiff below might, upon cross-examination, have been shown these and examined as to them; the introduction of them at the time they were let in, not only tended to confusion, but made farcical defendant's motion, at the termination of the plaintiff's case, to exclude all the plaintiff's evidence, and to instruct the jury to find for the defendant.

In an action for malicious prosecution, the burden is upon the plaintiff to show by a preponderance of the evidence, not only that the defendant was actuated by malice, but that he did not have probable cause for the action taken by him.

The existence of malice does not raise a presumption of want of probable cause; while from proof of want of probable cause, malice may, but it is not necessarily to be inferred.

If there be probable cause for a prosecution, it is immaterial that the prosecutor was actuated by malice, and also immaterial that the accused was not only found not guilty, but was actually innocent.

Where the circumstances presented to a prosecutor are such that they would induce in the mind of a cautious man a belief of the guilt of the party accused, no recovery can be had in an action for malicious prosecution, brought by the accused against the prosecutor. Jacks v. Stimpson, 13 Ill. 701; Wade v. Walden, 23 Ill. 425; Ross v. Innis, 35 Ill. 487; Chapman v. Cawrey, 50 Ill. 512; Mitchinson v. Cross, 58 Ill. 366; Montross v. Bradsby, 68 Ill. 185; Ames v. Snider, 69 Ill. 376; Palmer v. Richardson, 70 Ill. 544; Davie v. Wisher, 72 Ill. 262.

The judgment of the Circuit Court is reversed and the cause remanded.