In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-3985

LISA WILLIAMSON,

*Plaintiff-Appellant*,

*v.*

MARK C. CURRAN, JR.,
Sheriff of Lake County, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 562—**John W. Darrah**, *Judge*.

ARGUED APRIL 10, 2012—DECIDED APRIL 4, 2013

Before POSNER, ROVNER and HAMILTON, *Circuit Judges*.

ROVNER, *Circuit Judge*. Lisa Williamson was arrested along with her husband Lance on a charge that they had stolen someone else's horse. After being acquitted on the charge, Williamson filed suit against two Lake County, Illinois sheriff's deputies pursuant to 42 U.S.C. § 1983, alleging that they arrested her without probable cause in violation of the Fourth Amendment and de-

prived her of her Fourteenth Amendment right to equal protection by arresting her based on nothing more (she contends) than her status as Lance's wife. The district court dismissed both claims for failure to state a claim on which relief could be granted. *Williamson v. Curran*, 2009 WL 3817613 (N.D. Ill. Nov. 12, 2009); *see* Fed. R. Civ. P. 12(b)(6). We affirm.

## I.

As this case was dismissed at the pleading stage, we accept the factual allegations of Williamson's first amended complaint as true, granting Williamson the benefit of every reasonable inference that may be drawn from those allegations. *E.g.*, *Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013).

Williamson has referred to and attached a variety of documents to her complaint, including, for example, the investigator reports that culminated in the issuance of the warrant for her arrest. Federal Rule of Civil Procedure 10(c) provides that "written instruments" attached to a pleading become part of that pleading for all purposes. Thus, when a plaintiff attaches to the complaint a document that qualifies as a written instrument, and her complaint references and relies upon that document in asserting her claim, the contents of that document become part of the complaint and may be considered as such when the court decides a motion attacking the sufficiency of the complaint. *See, e.g.*, *Centers v. Centennial Mortg., Inc.*, 398 F.3d 930, 933 (7th Cir. 2005); *N. Indiana Gun & Outdoor Shows, Inc. v. City of*

*South Bend*, 163 F.3d 449, 452-53 (7th Cir. 1998). The traditional understanding of an instrument is a document that defines a party's rights, obligations, entitlements, or liabilities—a contract, for example. BLACK'S LAW DICTIONARY 869 (9th ed. 2009). Most of the documents that Williamson has appended to her complaint do not fit within that narrow understanding description of a written instrument. But we have taken a broader view of documents that may be considered on a motion to dismiss, noting that a court may consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *see also Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010); *Hecker v. Deere & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009); *Tierney v. Vahle*, 304 F.3d 734, 738-39 (7th Cir. 2002); *see, e.g., Bogie*, 705 F.3d at 608-09 (considering video cited in and attached to complaint); *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690-91 (7th Cir. 2012) (considering videos cited in complaint in support of copyright infringement claim and submitted by defendant in support of motion to dismiss). What makes it appropriate for us to consider the documents that Williamson has attached to her complaint is that she has not only cited them in the body of her complaint, but she has, to some degree, relied on their contents as support for her claims. *See, e.g.*, R. 35 at 8 ¶¶ 34, 37 (citing and attaching two different police reports and alleging that nothing in

these reports "made any reference to any act, error or omission of Lisa Williamson").

Thus, in the factual summary that follows, we have on occasion included statements that are drawn from the documents that Williamson has attached to and referenced in her complaint. Where we have done so, we have made it clear that this is what we are doing. As we discuss later in this opinion, Williamson has argued that it was inappropriate for the district court to consider these documents (along with additional documents submitted by the defendants) without converting the defendants' motion to dismiss into a motion for summary judgment. *See* Fed. R. Civ. P. 12(d). We reject that argument for the reasons we detail below. For now it is sufficient to note that where we have incorporated the exhibits to the complaint into our summary of the facts, we have done so based on Williamson's own reliance on these documents and in the absence of any indication from her—be it in the complaint or the briefing—that the documents are not genuine or that they have been falsified in some way. *See Hecker*, 556 F.3d at 582 (noting that plaintiff did not contest authenticity of documents defendant sought to use in moving to dismiss complaint). We add that where we have cited documents attributing particular statements to Williamson, whether or not she made these statements obviously is within her personal knowledge, so we may legitimately assume that if the statements have not been accurately recounted in the exhibits, she would have disavowed them. With that

said, we proceed with our summary of the facts as alleged in the complaint.

Marta Schroeder owned a horse named Chevallo, which she had purchased in January 2006 from the Lance Williamson Stables, LLC ("Williamson Stables") in Gurnee, Illinois, for $20,000. Lance Williamson ("Lance") was the owner and managing member of Williamson Stables. Schroeder kept the horse not at Williamson Stables but at Field & Fences Equestrian Center ("Field & Fences"), which was also in Gurnee. Christine Capuson was Chevallo's trainer at Field & Fences; she had also negotiated the purchase of the horse from Williamson Stables on Schroeder's behalf. In or about March 2007, Schroeder decided to sell the horse, and she commissioned Capuson to locate a buyer. Schroeder advised Capuson that she did not want either Williamson Stables or Lance to be involved with the sale.

Later that month, against Schroeder's expressed wish, Capuson contacted Lance, identified herself as Chevallo's trainer and Schroeder's agent, and told him she was looking for a buyer for the horse. Capuson asked Lance if he would show Chevallo to prospective buyers on consignment, given that he was already familiar with the animal. Lance advised Capuson that he did not have space in his barn for the horse at that time. But when Capuson followed up with him in late April and reported that she was still looking for a buyer, Lance agreed to board the horse and show him to prospective buyers. Lance advised Capuson that he would charge Schroeder a standard monthly fee for

the boarding, feeding, and care of the horse; Capuson in turn consented to this arrangement and directed Lance to send the invoices for these services to her as Schroeder's agent and not to Schroeder. On April 27, 2007, Jennifer Crow, the barn manager for Williamson Stables, picked up Chevallo from Field & Fences and transported him to Williamson Stables, where Chevallo thereafter remained. Lisa Williamson had nothing to do with this arrangement.

On or about June 30, 2007, Schroeder asked Capuson about the status of Capuson's efforts to locate a buyer for Chevallo. Capuson in turn called Lance. When Lance informed her that he had not found a buyer, Capuson demanded the return of the horse to her. Lance informed her that he would return the horse when he was paid for having boarded and cared for the horse.

Capuson then informed Schroeder for the first time that Chevallo was in the custody of Williamson Stables. It was at this point, Williamson alleges, that Capuson and Schroeder concocted a false story that Lance had stolen Chevallo, with the aim of regaining possession of the horse without having to pay Williamson Stables for its services. Capuson and Schroeder proceeded to the Lake County Sheriff's Department in order to file a report charging Williamson Stables and the Williamsons with theft. Although the complaint portrays Schroeder and Capuson as being equally culpable in reporting to the Sheriff's Department that Chevallo had been stolen and in allowing a criminal charge to be pursued against Williamson, R. 35 at 7-8 ¶¶ 31, 33, Williamson

alleges that Capuson kept Schroeder in the dark about the fact that she (Capuson) had asked Lance to try to find a buyer for the horse, R. 35 at 8 ¶ 35; *see also* R. 35 at 10 ¶ 44. So Williamson's theory apparently is that Schroeder understood from the start that the horse had not been stolen and that Williamson had nothing to do with Williamson Stables' possession of the horse, but that she did not know how in fact the horse had come to be in Lance's possession.

According to a written report by Sheriff's Deputy Anthony Fanella dated July 6, 2007, which Williamson has referenced in and attached to her complaint, Capuson represented that Lance had asked to take possession of Chevallo for a couple of days so that his wife could try him out and see if she liked the horse.[1] She had therefore allowed Lance's employee to pick up Chevallo and take him to Williamson Stables on the explicit understanding that he would be returned after Williamson took the horse for a test ride. After a week went by without the horse being returned to the Field & Fences stable, Capuson contacted Lance; he assured her that he would have someone bring the horse back. That did not occur, however, and Capuson said that her numerous follow-up telephone calls were not returned. Capuson did not disclose to Fanella that

---

[1] Williamson, by the way, denies that she had any involvement with the horse. The complaint alleges that she never rode Chevallo and, due to an injury, she would not have been able to ride a horse at that time.

she, in fact, had asked Lance to board the horse at Williamson Stables and show him to prospective customers or that she had agreed to pay Williamson Stables for Chevallo's care and boarding.

Fanella, accompanied by Capuson, visited Williamson Stables on the evening of July 1, 2007, to investigate Schroeder's complaint. There, they met Crow, the barn manager, who reported that the Williamsons were in California. Capuson checked the barn but did not see Chevallo there, and Crow she said did not know where he was.[2] Fanella advised Crow that the horse should be returned to Schroeder immediately or criminal charges would be filed. Capuson would later tell Sheriff's Deputy Ted Sittig that as she and Fanella were preparing to leave the premises, Crow approached Fanella and told him she had just spoken with Williamson by telephone, and that Williamson had told her she wanted Fanella and Capuson off the property and that she had placed a lien on the horse "for back board and other items." R. 50-1 Ex. 6 at 4.

That same evening, according to Fanella's report, Williamson spoke directly with Fanella by telephone. She informed him that money was owed to "them" for the care and boarding of Chevallo. R. 50-1 Ex. 5 at 2. Fanella inquired whether there was a signed agreement to board the horse, and Williamson told him there was

---

[2] The complaint alleges that Fanella himself did not personally inspect the premises and that the horse in fact was present.

not. Fanella advised her that the horse must be returned to Schroeder or charges would be filed. Williamson responded that "they" had a lien on the horse for the unpaid boarding charges. Fanella in turn admonished her that the horse could not be held "hostage" over the unpaid charges. R. 50-1 Ex. 5 at 2.

On July 2, Williamson Stables recorded a "Memorandum of Stable Keeper's Lien" against Chevallo for the unpaid boarding charges. The lien was asserted pursuant to the Illinois Innkeeper's Lien Act, 770 ILCS 40/49 (2007), which in relevant part provided that "[s]table keepers and any persons shall have a lien upon the horses, carriages and harness kept by them for the proper charges due for the keeping thereof and expenses bestowed thereon at the request of the owner, or the person having the possession thereof." § 40/49(b). The lien was prepared by Lance and makes no mention of Williamson.

On or about July 3, Schroeder prepared a written report that she filed with the Sheriff's office.[3] That report is referenced in and attached to the complaint. Among other representations, Schroeder's report asserted that Chevallo had been removed from Field & Fences and taken to Williamson Stables "without her notification and without approval." R. 50-1 Ex. 3 at 3. The report also averred that Schroeder, after learning that Williamson Stables had possession of the horse,

---

[3] Schroeder signed the report on July 10, 2007, but the report appears to have been prepared on July 3. We will refer to the report as Schroeder's July 3 report.

left multiple unreturned messages for Lance and Lisa Williamson, whom Schroeder's report described as co-owners of the stable. Lance eventually had left her a voicemail on July 5 to say that he had been out of town and that he wished to speak with her to clear up "this horse fiasco," but that he was on his way out of town again. R. 50-1 Ex. 3 at 2.

On July 6, Deputy Sittig paid a visit to Williamson Stables to further investigate Schroeder's complaint. His report summarizing the visit is attached to and referenced in Williamson's complaint. According to Sittig's report, he spoke with Crow, who confirmed that Williamson Stables had possession of Chevallo but said that the horse was subject to a lien for unpaid boarding charges. Sittig asked to speak with either Lance or Lisa Williamson but was told they were not on the premises. Crow placed a telephone call to Williamson from the stable so that Sittig could speak with her. Williamson told Sittig that he had no business being at the stable, that "the horse had been at their property for quite . . . some time," that "the owner owed them money," and "that they had a lien on the horse." R. 50-1 Ex. 6 at 2. Sittig apprised her that, based on what he had been told, the horse was not legally on their property and should be returned to its owner at once. According to Sittig, Williamson demurred, informing him that Schroeder "actually brought the horse to her property for her to sell" and that "she would not" be returning the horse. R. 50-1 Ex. 6 at 2. Sittig, according to the complaint, admonished Williamson to return the horse "or this matter will come back to bite you in the ass." R. 35

at 15 ¶ 75. Before Sittig left the premises, Crow gave him a copy of the lien showing that $1,985 was owed to the stable. Sittig told her that the lien was "irrelevant." R. 35 at 8 ¶ 36.

Sittig's report also recounts an in-person conversation with Capuson on July 7. Capuson reiterated to Sittig that she lent Chevallo to Lance to try out for three to four days. When she followed up with him at the conclusion of that period, Lance advised her that he was not interested in buying the horse because he was "too quiet." R. 50-1 Ex. 6 at 3. Capuson asked him to send the horse back to Field & Fences, but months went by without the horse's return. Capuson told Sittig that she had visited Williamson Stables with Deputy Fanella on July 1 but had not seen Chevallo there when she looked through the barn stalls. Capuson denied that she had sent the horse to Williamson Stables for Lance to sell; she had only given Lance permission to keep the horse for a few days for a test ride. Sittig's report acknowledged that Williamson Stables had recorded a lien against the horse, but according to the complaint, he never asked Capuson about the lien.

Although they were aware of the lien, Sittig and Fanella did not view it as a defense to the accusation that the Williamsons had wrongful possession of Chevallo. They concluded that the lien had been issued under false pretenses, given the lack of a written contract for boarding the horse.

On July 10, a Lake County judge issued arrest warrants for both Williamson and her husband after criminal informations were filed by the Lake County State's At-

torney on the same date charging both of the Williamsons with theft pursuant to 720 ILCS 5/16-1(a)(1)(A). Lance and Lisa Williamson were arrested on July 14, 2007. They pleaded not guilty to the theft charge, and a bench trial took place in June 2008. They were both acquitted: the court found that they had no intention to permanently deprive Schroeder of possession of the horse.

In the meantime, Schroeder had filed a civil suit against Lance and Williamson Stables in August 2007.[4] That suit ultimately was settled, and Schroeder finally regained possession of the horse in November 2008, after she paid Williamson Stables a portion of what it asserted it was owed for boarding Chevallo.

Williamson subsequently filed this suit against Deputies Sittig and Fanella, among other defendants. Two counts of her first amended complaint, both naming the deputies as defendants, are relevant to

---

[4] The complaint alleges that Schroeder and Capuson allowed the criminal case to be pursued against Williamson, despite knowing that she had nothing whatsoever to do with the horse, in order to help Schroeder gain a strategic advantage in her civil dispute with Lance and Williamson Stables. There are also additional allegations concerning Schroeder's attorney in the civil action and her ties to the Sheriff's Department, which Williamson cites as a reason why the deputies initiated the criminal charge against the Williamsons. In view of our conclusion below that the deputies had probable cause to arrest Williamson for theft, we see no need to discuss those additional allegations in this opinion.

this appeal: a claim that she was arrested without probable cause to believe that she had committed a crime, in violation of the Fourth Amendment, and a class-of-one Fourteenth Amendment equal protection claim premised on the theory that Sittig and Fanella arrested her based solely on her status as Lance's wife without any evidence that she had anything to do with Williamson Stables' possession of the horse, in contrast to other cases in which wives were not arrested based on the purported criminal acts of their husbands.

The district court dismissed both claims pursuant to Rule 12(b)(6). *Williamson v. Curran*, *supra*, 2009 WL 3817613. With respect to the false arrest claim, the court reasoned that because Williamson had been arrested pursuant to a facially valid warrant, she would have to show that the deputies knew the warrant had been issued without probable cause. Yet, Williamson's contention that there was no evidence to implicate her in the alleged theft of the horse was "belied by her own Complaint." *Id.*, at *3. Williamson's own statements, as recounted in the exhibits to the complaint, gave the deputies reason to believe that Williamson her-self shared possession of the horse and had an intent to permanently deprive Schroeder of the use of the horse. "Plaintiff admitted that she had the horse, insisted on her legal right to possess the horse and refused to return the horse." *Id.*, at *4. The lien, which was issued after Capuson and Schroeder complained that the horse had been stolen and an investigation had commenced, did not alter the legal calculus. "Plain-

tiff has cited no authority supporting the claim that law enforcement may not pursue an investigation once a lien has been filed. If this were the law, one unlawfully in possession of property could obviate criminal prosecution by simply filing a lien." *Id.* That the deputies had reason to believe that Williamson was implicated in the wrongful possession of the horse defeated her class-of-one equal protection claim as well. That claim would, at a minimum, demand proof that Williamson had been treated differently from others similarly situated, without a rational basis for the differential treatment. Yet, "the facts alleged, as augmented through the documents attached to the Complaint, . . . provide a rational basis for [Williamson's] arrest." *Id.*, at *5.

## II.

### A.  False arrest claim

Williamson's claim of false arrest hinges on the contention that Deputies Sittig and Fanella lacked probable cause to believe that she had committed a crime. *See, e.g.*, *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012); *Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1056 (7th Cir. 2011). "Probable cause exists if 'at the time of the arrest, the facts and circumstances within the officers' knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id.* (quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009)). The existence of probable cause does not

depend on the truth of a complaint of wrongdoing. *Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006) (citing *Woods v. City of Chicago*, 234 F.3d 979, 987 (7th Cir. 2000)). So long as an officer reasonably believes the putative victim of or eyewitness to a crime is telling the truth, he may rely on the information provided to him by such persons in deciding to make an arrest, without having to conduct an independent investigation into their accounts. *See, e.g.*, *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 680 (7th Cir. 2007); *Askew v. City of Chicago*, 440 F.3d 894, 895-96 (7th Cir. 2006); *Gramenos v. Jewel Cos.*, 797 F.2d 432, 439 (7th Cir. 1986). This is so even when the suspect denies an accusation of wrongdoing. *See, e.g.*, *Reynolds v. Jamison*, 488 F.3d 756, 762 (7th Cir. 2007). When presented with a credible report of criminal behavior, an officer "'[is] under no constitutional obligation to exclude all suggestions that the witness or victim is not telling the truth.'" *Id.* (quoting *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003)).

Thus, assuming, as Williamson has alleged, that Schroeder and Capuson were dissembling when they told the Sheriff's deputies that the Williamsons had taken wrongful possession of Chevallo, the falsity of their report by itself does not mean that Sittig and Fanella lacked probable cause to believe that Williamson had committed or was committing a crime. Williamson herself does not argue that the deputies could not reasonably credit what Schroeder and Capuson had told them. Rather, Williamson makes two central points in support of her contention that she was arrested without probable cause: (1) that she was arrested solely on the

basis of her marital relationship with Lance, who was the managing member of Williamson Stables, and in the absence of any information suggesting that she herself had some involvement in obtaining or maintaining possession of the horse; and (2) because Williamson Stables had a lien on the horse, the lien negated any probable cause to believe that either she or her husband was improperly exerting control over the horse.

Before we reach these arguments, we must first deal with what Williamson contends was a procedural error in the district court's decision to dismiss the false arrest claim. In the district court (as they have in this court), Sittig and Fanella invoked the general rule that a person arrested pursuant to a facially valid arrest warrant cannot prevail on a section 1983 claim of false arrest. *See, e.g., Brooks v. City of Aurora, Ill.*, 653 F.3d 478, 483 n.5 (7th Cir. 2011); *Juriss v. McGowan*, 957 F.2d 345, 350 (7th Cir. 1992) (citing, inter alia, *Baker v. McCollan*, 443 U.S. 137, 143, 99 S. Ct. 2689, 2694 (1979)); R. 38 at 4. Williamson in turn invoked an exception to that rule, namely that a facially valid warrant will pose no bar to a claim of false arrest when the officers responsible for effectuating the arrest knew that the warrant was issued without probable cause. *See Juriss*, 957 F.2d at 350-51; R. 54 at 7-8, 10. Obviously, the application of the rule and the exception begin with consideration of whether there was in fact a facially valid arrest warrant. Sittig and Fanella submitted certified copies of both the warrant for Williamson's arrest and the charging document (the information), as well as an abstract of the court

proceedings that ensued from the arrest and charge. R. 37-1. Williamson contends that the court relied on these and other documents outside of the complaint in order to determine both that the deputies took her into custody pursuant to a facially valid arrest warrant and that, based on the facts and circumstances known to them, they had no reason to doubt that the warrant was supported by probable cause. Williamson Br. 22-23. In looking to these documents, Williamson argues, the district court ran afoul of its obligation, pursuant to Federal Rule of Civil Procedure 12(d), to convert the motion into one for summary judgment and to afford her the opportunity for discovery before ruling on the motion.

The argument is frivolous as to the issuance of an arrest warrant. True enough, the court's analysis did proceed from the premise that Williamson was arrested pursuant to a facially valid warrant. 2009 WL 3817613, at *2 (noting that an arrest warrant was issued) and *4 (noting that the arrest warrant was facially valid). Yet, as the defendants point out, the complaint itself alleged that arrest warrants were issued for Williamson and her husband. R. 35 at 9 ¶ 39 & 16 ¶ 83. The complaint did not acknowledge that the warrant for Williamson's arrest was facially valid; but there has never been any real dispute that it was.[5] To the extent that the court

---

[5] The warrant identified Williamson by name, date of birth, physical description, and address, among other data; it

(continued...)

took notice of and relied upon the copies of the warrant and criminal information that the defendants submitted, Williamson has not shown that it deprived her of the opportunity to conduct discovery and to present contrary evidence on a point of genuinely disputed fact.

At first blush, it might seem that there is more substance to Williamson's contention that the court erred by looking to the facts known to Sittig and Fanella at the time of Williamson's arrest in order to assess the viability of Williamson's allegation that the deputies knew the warrant for her arrest was issued without probable cause. Often, an assessment of the facts within an officer's knowledge will be a matter for summary judgment, if not trial, rather than a motion to dismiss. However, as we have noted, what the district court looked to as evidence of what Sittig and Fanella knew were not the documents that the defendants submitted and of which they asked the court to take judicial notice, but rather the documents that Williamson

---

(...continued)

indicated that an information had been filed charging her with theft of Schroeder's horse between May and July 2007, in violation of 720 ILCS 5/16-1(a)(1)(A); it reflected that an ex parte hearing had been held and that probable cause had been found; it commanded that Williamson be arrested and brought before a judge without unnecessary delay; and the warrant was signed by a judge. *See* U.S. CONST. amend. IV; Fed. R. Crim. P. 4(b)(1); 3 Wayne R. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT, § 5.1(h) (5th ed. 2012).

herself had attached to her own complaint. As we remarked at the outset of our factual summary, Federal Rule of Civil Procedure 10(c) provides that a written instrument attached to a pleading becomes part of that pleading, so when the plaintiff has attached an instrument to her complaint, a court may consider the contents of that instrument in ruling on a motion to dismiss. And as we noted, this circuit has taken a relatively expansive view of the documents that a district court properly may consider in disposing of a motion to dismiss. *See Geinosky v. City of Chicago*, *supra*, 675 F.3d at 745 n.1; *Hecker v. Deere & Co.*, *supra*, 556 F.3d at 582-83; *Tierney v. Vahle*, *supra*, 304 F.3d at 739.

Neither Williamson nor the appellees have attempted to parse out which of the documents she appended to her complaint, if any, might qualify as an instrument that the court could consider in assessing the viability of her complaint. Instead, Williamson has made a blanket argument that none of these documents was appropriately considered in assessing whether the defendants had probable cause to arrest her, whereas the defendants have contended that all of the documents were fair game.

The key documents whose contents the district court considered in assessing the facts known to the deputies were their own investigative reports, along with the written statements that Schroeder and Capuson submitted to the Sheriff's Department; and we believe that the district court properly took these documents into account. Williamson not only attached these documents

to her complaint but affirmatively relied on them in support of her claim. She cited the reports that Schroeder and Capuson filed as proof of the allegedly false story that they concocted in an effort to secure the return of Chevallo without paying the outstanding bill for his boarding. And in both her complaint and her memorandum in opposition to the deputies' motion to dismiss, she cited the reports prepared by Sittig and Fanella as proof that none of the facts known to the two deputies implicated herself in the possession of the horse. R. 35 at 8 ¶¶ 34, 37; R. 54 at 6. She has done the same in her appellate briefs. By citing and relying on such documents as affirmative proof of her lack of involvement in the possession of the horse—and thus the lack of probable cause to arrest her—Williamson invited the district court—and has likewise invited this court—to consider these documents in ruling on the motion to dismiss.

We shall have a last word to say about the district court's reliance on the investigative reports and other documents attached to Williamson's complaint in our discussion of probable cause a bit later in this opinion. For the moment it is enough to note that the district court did not commit any procedural error in considering such documents in ruling on the motion to dismiss.

The fact that Williamson was arrested pursuant to a facially valid arrest warrant narrows the circumstances under which she could prevail on her false arrest claim. As we stated in *Juriss v. McGowan:*

Generally, a person arrested pursuant to a facially valid warrant cannot prevail in a § 1983 suit for false arrest; this is so even if the arrest warrant is later determined to have an inadequate factual foundation. *Baker v. McCollan*, 443 U.S. 137, 143, 99 S. Ct. 2689, 2694 (1979); *Mark* [*v. Furay*], 769 F.2d [1266] at 1268 [(7th Cir. 1985)]. There was (and still is), however, a recognized exception for situations where officers responsible for bringing about an unlawful arrest knew that the arrest warrant had issued without probable cause; this is particularly true of officers who knew that those who obtained the warrant had deceived the authorizing body. *Malley v. Briggs*, 475 U.S. 335, 345, 106 S. Ct. 1092, 1098 (1986); *Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir. 1985). Under these circumstances, even a facially valid arrest warrant does not shield otherwise unreasonable conduct.

957 F.2d at 350-51; *see also Betker v. Gomez*, 692 F.3d 854, 864 (7th Cir. 2012); *Beauchamp v. City of Noblesville, Ind.*, *supra*, 320 F.3d at 742-43; *Neiman v. Keane*, 232 F.3d 577, 579-80 (7th Cir. 2000). Thus, in order to prevail on her false arrest claim, Williamson ultimately would have to show not only that there was no probable cause to believe she had committed a crime, but also that Sittig and Fanella knew that the arrest warrant was issued without probable cause. *Juriss*, 957 F.2d at 350-51.

We mentioned earlier that Williamson was charged with theft pursuant to 720 ILCS 5/16-1(a)(1)(A). At the time of the events at issue in this case, that statute pro-

vided that "[a] person commits theft when he knowingly: (1) [o]btains or exerts unauthorized control over property of the owner; . . . and (A) [i]ntends to deprive the owner permanently of the use or benefit of the property[.]" (2006). The facts alleged in the complaint would not support an inference that Williamson Stables wrongfully came into possession of Schroeder's horse in the first instance. Recall that Capuson, as Schroeder's agent, is alleged to have asked Lance to take Chevallo so that he might show the horse to prospective buyers. According to the complaint, she later lied to the Sheriff's deputies (and apparently to Schroeder as well), telling them that Lance had asked to take the horse for a few days so that Williamson could try the horse out. Under either scenario, the Williamsons first came into possession of the horse with Capuson's consent as Schroeder's agent, and thus they did not wrongfully obtain control over the horse. But the statute recognizes that a person may nonetheless commit theft when he "exerts unauthorized control over" another person's property, as by refusing to return the property to its rightful owner. *See People v. Alexander*, 442 N.E.2d 887, 889-90 (Ill. 1982) (defendant may be guilty of theft based solely on his knowing exertion of unauthorized control over another's property at time of his arrest, because crime of theft is not limited to original taking of property); *accord People v. Price*, 850 N.E.2d 199, 204-05 (Ill. 2006) (same); *see also, e.g., People v. Fuller*, 533 N.E.2d 1111, 1113 (Ill. App. Ct. 1988) (where defendant was originally given money by victim to post bond for victim's jailed daughter, defendant

"was not authorized to retain, spend or abandon the $400 or use it for any purpose other than" posting bond; thus, despite evidence of defendant's good intentions at outset, jury could find that once victim demanded her money back and defendant failed to return it, defendant instead intended to permanently deprive victim of her property, thereby committing crime of theft). The Williamsons thus could have been reasonably suspected of theft if they wrongfully exerted control over Chevallo by refusing Capuson's and Schroeder's demands that they return the horse. It is in this respect that the lie Capuson allegedly told the deputies was important, for it suggested that Lance had asked to take Chevallo just for a few days for the purpose of trying out the horse, but then held onto the horse and refused to return Capuson's and Schroeder's multiple telephone calls. Under that scenario, we may assume that Capuson had not agreed to pay Williamson Stables for the care and boarding of the horse, that neither Williamson Stables nor the Williamsons had a legitimate claim to compensation for such fees and no basis to assert a lien against the horse, and that the Williamsons thus had no grounds on which to retain possession of the horse, particularly once the Sheriff's deputies admonished them to return Chevallo to Schroeder.

The next question is whether, on the facts alleged in the complaint, the defendants had any reason to believe that Williamson herself was involved with the stable's refusal to surrender Chevallo to Schroeder and Capuson.

The complaint alleges that Lance was the owner and managing director of Williamson Stables and that Williamson occupied no ownership or managerial role in relation to the stables. Williamson thus alleges that she had no responsibility for the stable's possession of the horse and the authorities had no reason to suppose that she might be culpable for the stable's unauthorized exertion of control over the horse. She contends, as we have noted, that the deputies simply assumed she was culpable based on her status as Lance's wife.

Yet, although Williamson has alleged that she had no involvement with the stable's possession of the horse, the investigative reports attached to her complaint—which, as we have discussed, she invited the court to examine and thus became part of her complaint—indicate that Deputies Sittig and Fanella had at least some grounds to believe otherwise. *First*, it was Williamson rather than her husband who responded to the deputies' inquiries about Chevallo. *Second*, in her multiple interactions with the deputies (directly and through Crow), Williamson referred both to herself individually and to her husband and herself jointly in discussing possession of the horse. For example, Capuson's written statement of July 7 notes that when she and Fanella visited the Williamson Stables on July 1, barn manager Crow, after speaking with Williamson by telephone, reported to them that "Lisa had decided to put a lien on the horse." R. 50-1 Ex. 4 at 5. Fanella's own report of July 6 noted that when he spoke directly with Williamson on the evening of July 1 (after his visit to the stable), Williamson told him that

the horse's owner owed "them" money for the care and boarding of the horse and that "they" had a lien on the horse for the unpaid charges. R. 50-1 Ex. 5 at 2. It is a reasonable inference from Crow's statement that "Lisa" would be filing a lien against the horse, and from Williamson's subsequent remarks to Fanella that "they" were owed money and had a lien on the horse, that Williamson was not a mere bystander to the dispute over the horse but rather shared responsibility with her husband in refusing to turn over the horse to Schroeder and Capuson. Sittig's report of his own visit to the stable on July 6, and his telephone conversation with Williamson during this visit, supports the same inference. Williamson, according to Sittig, told him that "the horse had been at their property for quite some time," that the horse's owner owed "them" money, and that "they had a lien on the horse." R. 50-1 Ex. 6 at 2. She also told Sittig that Schroeder "brought the horse to her property to sell" and that "she would not" be returning the horse. R. 50-1 Ex. 6 at 2. These remarks reinforce the inference that Williamson as well as her husband was exerting control over the horse. *Third*, Williamson never disclaimed involvement or responsibility with the horse or with the stable generally, nor did she say that she was speaking solely as her husband's representative. *Fourth*, Schroeder in her July 3 statement represented that Williamson was a co-owner of the stable. Sittig and Fanella thus had reasonable grounds to believe that Williamson was at least partially responsible for the stable's refusal to turn over the horse; and their reports belie the contention

that the decision to arrest Williamson was based solely on her status as Lance's wife.

The deputies' reports of course constituted their version of events—more to the point, their recounting of what Williamson said. As we have discussed at some length, Williamson has attached these reports to her complaint and relied on them for her own purposes without disowning their accuracy as summaries of what information had been communicated to the deputies concerning Williamson Stables' possession of the horse. If Williamson had denied the remarks attributed to her in these reports, which she was free to do, then we would in the usual case be obliged to credit her denial on a motion to dismiss. *See generally*, *e.g.*, *Peters v. West*, 692 F.3d 629, 632 (7th Cir. 2012). Yet, although Williamson denies any responsibility for the horse, she never, in the briefing below or in this court, denied uttering the words Sittig and Fanella attribute to her in their reports.[6] The same is obviously true with respect to the written statements that Capuson and Schroeder filed with the Sheriff's Department: Wil-

---

[6] At oral argument, Williamson's counsel for the first time suggested that the reports were not entirely accurate in recounting her statements. But nowhere in the complaint, her memoranda opposing the motion to dismiss, or in the briefing on appeal has Williamson made this assertion. What Williamson said to Crow and to the deputies has always been a matter within her personal knowledge. If the reports did not accurately characterize her statements, she was obliged to note that fact earlier.

liamson, for example, denies the truth of Schroeder's representation that Williamson was a co-owner of Williamson Stables, but she does not deny that Schroeder made that representation to the Sheriff's Department. And, more generally, although Williamson alleges that Schroeder and Capuson were misrepresenting the facts to the Sheriff's Department, she does not dispute what they actually told the Sheriff's deputies. Collectively, these reports, as we have said, indicate that the deputies were relying on more than her marital status in deciding to arrest her—that they had reason to believe she was directly involved in and shared responsibility for the refusal to return the horse to Schroeder and Capuson. This, in turn, precludes a finding that they knew the warrant for Williamson's arrest was issued without probable cause.

According to the complaint, Sittig did admit at Williamson's criminal trial that "he had no evidence that Lisa Williamson had any involvement with the Lance Williamson Stables in connection with its possession of the Horse and its efforts to sell the Horse." R. 35 at 20 ¶ 107 & 21 ¶ 117. Fanella allegedly made a similar admission. R. 35 at 19 ¶¶ 103, 104. *See also* R. 35 at 19-21 ¶¶ 102, 105-106, 108-11, 116. Williamson has argued that these allegations are sufficient to support her claim that the deputies knew there was no probable cause to believe that she had stolen (or helped to steal) the horse. That may be so when the allegations are read in isolation, but not in the context of the complaint as a whole. These allegations do not purport to disavow the information set forth in the deputies' reports, for

example, including in particular the statements attributed to Williamson in those reports. The deputies' admissions at trial thus do not require us to ignore the information known to the deputies, which for the reasons we have discussed did point to Williamson's involvement with the stable's possession of Chevallo. Moreover, the deputies' admissions constituted their subjective assessment of the evidence they had (or did not have) at the time of Williamson's arrest. But, of course, their understanding is immaterial for purposes of the probable cause determination. The standard governing that determination is an objective one which asks what a reasonable person would be warranted in believing based on the facts known to the arresting officer, not what the arresting officer actually thought or what his motivation was. *Silven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 927-28 (7th Cir. 2011) (officer's belief as to basis for detention irrelevant to probable cause analysis) (quoting *Potts v. City of Lafayette, Ind.*, 121 F.3d 1106, 1113 (7th Cir. 1997)); *see also United States v. Hines*, 449 F.3d 808, 815 n.7 (7th Cir. 2006); *Richardson v. Bonds*, 860 F.3d 1427, 1430-31 & n.2 (7th Cir. 1988); *see generally Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774 (1996); *Ornelas v. United States*, 517 U.S. 690, 696, 116 S. Ct. 1657, 1661-62 (1996); *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013). The facts known to Sittig and Fanella, including Williamson's own statements indicating that she along with her husband was exerting control over the horse, were sufficient to warrant a reasonable belief that she too was involved in the purported theft.

Perhaps the deputies can be faulted for not looking into Williamson's status with respect to the stable. So far as the complaint reveals, the only evidence they had in that regard was Schroeder's description of Williamson as a co-owner of the stable in the July 3 report she filed with the Sheriff's Department. That may have been Schroeder's assumption or impression; but Schroeder was not situated, as the stable's attorney or its employee would have been, to know who owned and managed the stables and controlled the horses boarded there. And so far as the deputies' own reports reveal, they made no effort to ascertain whether Williamson was in fact a co-owner of the stable or played any management role in the stable's operations. These were facts that could have been verified independently, and had the deputies done so Williamson might not have been arrested.

However, the deputies' apparent failure to look more closely into Williamson's role at the stable—even though it might have led the deputies not to seek an arrest warrant for Williamson—does not suggest that they knew probable cause to arrest Williamson was lacking. As we have said, Williamson's own remarks to the deputies suggested that she was more than a mere bystander to the dispute over Chevallo.

The slightly more difficult question is whether the stable's lien on Chevallo, of which the deputies were aware, undermined if not precluded an inference that Williamson, along with her husband, were wrongfully exerting control over the horse. The lien amounted

to formal confirmation that Williamson Stables was asserting a legal right to retain possession of the horse, based on unpaid bills for the horse's boarding. (The Innkeeper's Lien Act was not amended to expressly authorize a stable keeper to retain possession of a boarded animal in these circumstances until 2012, well after the events at issue here occurred. *See* 770 ILCS 40/49(c), added by Pub. Act. No. 97-569 (enacted Aug. 25, 2011 and effective Jan. 1, 2012). We may nonetheless assume, without deciding, that Illinois cases granted this right to a stable keeper in 2007. *See Tumalty v. Parker*, 1902 WL 1781, at *3-*4 (Ill. App. Ct. 1902) (owner's surreptitious removal of horse from keeper's barn, knowing that keeper had lien on horse for unpaid boarding charges, amounted to larceny).) In practical terms, the lien was also a warning sign that the deputies were placing themselves in the middle of a civil dispute between Schroeder and Williamson Stables—one that could be resolved in civil court, as it ultimately was—without criminal charges. But insofar as Williamson's false arrest claim goes, the lien matters insofar as it suggested that Williamson Stables (and the Williamsons) might have a legitimate, legal ground on which to exert control over the horse.

However, a stable keeper's lien is premised upon an agreement to pay the stable for boarding. *See Bender v. Consol. Mink Ranch, Inc.*, 441 N.E.2d 1315, 1320 (Ill. App. Ct. 1982) (citing *Reynolds ex rel. Jones v. Weakly*, 12 N.E.2d 689, 691 (Ill. App. Ct. 1938)); *see also* 3B C.J.S. *Animals* § 111 (Westlaw through March 2013). Such an agreement need not be written, as Sittig and Fanella appeared to

believe, *see, e.g., Reynolds*, 12 N.E.2d at 692 (noting that requisite agreement can be express or implied); but nonetheless there had to be some type of agreement, *id.* Needless to say, if a stable has converted an animal, it cannot properly assert a lien for boarding the animal. *Bender*, 441 N.E.2d at 1420. So the lien begs the question: was there an agreement to board Chevallo at Williamson Stables?

The facts known to the officers, as revealed in both the complaint and the investigatory reports attached thereto, were inconsistent with any agreement to pay Williamson Stables for boarding Chevallo. Williamson herself admitted to Fanella that there was no signed (i.e., written) agreement to board Chevallo. As we have said, the lack of a written agreement does not rule out the existence of an express oral agreement to pay Williamson Stables for boarding the horse—which the complaint in fact attributes to Capuson—or an implied agreement. But more to the point, Schroeder and Capuson told the deputies that there was no agreement to board the horse. They represented that Lance had asked to borrow Chevallo for a few days to try the horse out and then inexplicably refused to return the horse. Their account is contrary to the complaint's allegations as to what was really going on—that Capuson in fact had engaged Lance to show the horse and had expressly agreed to pay for boarding the horse at Williamson Stables. Again, however, the complaint does not allege that the deputies knew that this was the arrangement between Capuson and the stable. To the contrary, the complaint itself asserts that Schroeder and Capuson

deceived the two deputies. In short, no inference arises, either from the face of the complaint or attached exhibits, including the investigator reports, that the deputies had any inkling they were being lied to by complainants. So far as they knew, there was no agreement to board Chevallo at Williamson Stables; rather, Lance asked to take possession of Chevallo for a few days for his own purposes and thereafter refused—wrongfully— to return the horse. On that understanding of events, the deputies could legitimately disregard the lien.

In sum, Williamson has pleaded herself out of court. The facts set forth in both the body of her complaint and the incorporated exhibits reveal that the deputies had reason to believe that the horse Chevallo was not in the rightful possession of Williamson Stables and that Williamson was responsible along with her husband for the refusal to return the horse to its owner.

B.   Class-of-One Equal Protection Claim

Williamson also contends that the decision to arrest her deprived her of her Fourteenth Amendment right to equal protection. *See Geinosky v. City of Chicago*, *supra*, 675 F.3d at 747 (recognizing that such a claim can be asserted based on the irrational or malicious application of law enforcement powers). Although the standard for a class-of-one equal protection claim like Williamson's currently is unsettled in this circuit, *see Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887 (7th Cir.) (en banc) (5-5 division resulting in no controlling opinion), *cert.*

*denied*, 133 S. Ct. 654 (2012), the claim at a minimum would require proof that the defendants intentionally treated Williamson differently from others situated similarly to her for no rational reason. *Thayer v. Chiczewski*, *supra*, 705 F.3d at 254. Like the false arrest claim, then, the class-of-one equal protection claim hinges on the notion that the authorities lacked probable cause to arrest Williamson, as the existence of probable cause necessarily means that there was a legitimate reason to arrest her. *See Kim v. Ritter*, 493 F. App'x 787, 2012 WL 4373342, at *2 (7th Cir. Sep. 26, 2012) (non-precedential decision) (citing *Wagner v. Washington Cnty.*, 493 F.3d 833, 836 (7th Cir. 2007) (per curiam), and *Askew v. City of Chicago*, *supra*, 440 F.3d at 895), *cert. denied*, 133 S. Ct. 984 (2013).

This claim consequently fails for the same reason that the false arrest claim does. The allegations of the complaint, coupled with the exhibits attached thereto, indicate that Sheriff's deputies were deceived into thinking that Lance had taken possession of Chevallo ostensibly to try him out for a few days, and absent any agreement by the horse's owner, Schroeder, or her agent, Capuson, to board the horse at Williamson Stables and to compensate the stable for its boarding and care of the horse. So far as the deputies knew, Lance was in the wrong in maintaining possession of the horse, and the lien filed by Williamson Stables was a ruse to give cover to his conversion of the horse and, quite possibly, to extort money from the horse's owner. And, as we have discussed, the deputies had reason to believe, based in large part on Williamson's own in-

teraction with them, that she shared responsibility along with her husband and Williamson's Stables for the possession of and refusal to surrender the horse. In short, the deputies had reasonable grounds on which to believe that Williamson, like her husband, was guilty of theft, even if, as the complaint alleges, they had been duped by Capuson and Schroeder.

### III.

The district court properly dismissed Williamson's false arrest and class-of-one equal protection claims. The facts set forth in the complaint and the exhibits referenced and incorporated into the complaint indicate that the authorities had probable cause to arrest her for theft in violation of Illinois law.

AFFIRMED.